1999-NMSC-005

975 P.2d 841

NEW MEXICO RIGHT TO CHOOSE/NARAL, Abortion and Reproductive Health Services, Planned Parenthood of the Rio Grande, Curtis Boyd, M.D., Lucia Cies, M.D., Bruce Ferguson, M.D., and Lewis Koplik, M.D., Plaintiffs–Appellees and Cross–Appellants,

v.

William JOHNSON, Secretary of the New Mexico Human Services Department, Defendant–Appellant and Cross–Appellee,

and

Eugene E. Klecan and Donald Schaurete, Defendants–in–Intervention and Appellants and Cross–Appellees.

No. 23,239.

Supreme Court of New Mexico.

Nov. 25, 1998.

Crider, Calvert & Bingham, P.C., Stevan Douglas Looney, Special Assistant Attorney General, Albuquerque, White, Koch, Kelly & McCarthy, P.A., M. Karen Kilgore, Santa Fe, Charles J. Milligan, General Counsel, New Mexico Human Services Department, Santa Fe, for Appellant and Cross–Appellee, William Johnson, Secretary of Human Services Department.

Eugene E. Klecan, Albuquerque, for Appellants and Cross–Appellees Eugene E. Klecan and Donald Schaurete.

Freedman, Boyd, Daniels, Peifer, Hollander, Guttmann & Goldberg, J. Michele Guttmann, Albuquerque, Louise Melling, Cather-

ine Weiss, Reproductive Freedom Project, American Civil Liberties Union Foundation, New York City, NY, Cynthia A. Fry, Albuquerque, Priscilla Smith, Catherine Albisa, Center for Reproductive Law & Policy, New York City, NY, Ann Scales, Albuquerque, Maureen Sanders, Albuquerque, Philip B. Davis, ACLU of New Mexico, Albuquerque, Roger Evans, Legal Action for Reproductive Rights, Planned Parenthood Federation of America, New York City, NY, Carpenter & Chavez, Ltd., David J. Stout, Albuquerque, for Appellees and Cross–Appellants.

Paul Benjamin Linton, Acting General Counsel, Americans United for Life, Chicago, IL, for Amici Curiae Senator Duncan Scott, Representative Frank Bird, and Other Members of the New Mexico Legislature.

Bopp, Coleson & Bostrom, James Bopp, Jr., John K. Abegg, Terre Haute, IN, for Amicus Curiae Right to Life Committee. of New Mexico.

Hon. Tom Udall, Attorney General, Martha A. Daly, Elizabeth A. Glenn, Assistant Attorneys General, Santa Fe, for Amicus Curiae New Mexico Attorney General.

Michael B. Browde, Christian G. Fritz, Albuquerque, for Amici Curiae New Mexico League of Women Voters and New Mexico Legislators.

Martha F. Davis, Deborah A. Ellis, NOW Legal Defense and Education Fund, New York City, NY, Rondolyn R. O'Brien, Albuquerque, for Amici Curiae New Mexico Women's Bar Association and New Mexico Public Health Association.

## OPINION

MINZNER, J.

{1} This case concerns the authority of the Secretary of the New Mexico Human Services Department to restrict funding for medically necessary abortions under the State's Medicaid program. The Secretary appeals the district court's order permanently enjoining the Department from enforcing a rule that prohibits the use of state funds to pay for abortions for Medicaid-eligible women except when necessary to save the life of the mother, to end an ectopic pregnancy, or when the pregnancy resulted from rape or incest. Under the district court's order, the Department must allow the use of state funds to pay for abortions for Medicaid-eligible women when they are medically necessary. Under the court's order, an abortion is "medically necessary" when a pregnancy aggravates a pre-existing condition, makes treatment of a condition impossible, interferes with or hampers a diagnosis, or has a profound negative impact upon the physical or mental health of an individual.

{2} The Court of Appeals certified the appeal to this Court because it presented a significant question of law under the New Mexico Constitution. Based on the independent grounds provided by the Equal Rights Amendment to Article II, Section 18 of our state constitution, we affirm the district court's order. New Mexico's Equal Rights Amendment requires a searching judicial inquiry to determine whether the Department's rule prohibiting state funding for certain medically necessary abortions denies Medicaid-eligible women equality of rights under law. We conclude from this inquiry that the Department's rule violates New Mexico's Equal Rights Amendment because it results in a program that does not apply the same standard of medical necessity to both men and women, and there is no compelling justification for treating men and women differently with respect to their medical needs in this instance. The district court did not exceed its authority in providing a remedy for this constitutional violation by enjoining the Department from enforcing its rule and requiring the Department to apply the standard of medical necessity in a nondiscriminatory manner in this case.

{3} As an alternative basis for affirming the district court's order, Plaintiffs argue that a woman's right to reproductive choice is among the inherent rights guaranteed by Article II, Section 4 of the New Mexico Constitution, and that the Department's rule unlawfully infringes upon this right because it favors childbirth over abortion. It is unnecessary for us to reach the broader questions raised by this argument, however, because we decide this appeal based upon the Department's violation of the Equal Rights

Amendment to Article II, Section 18 of our state constitution. Thus, our discussion is limited to the protection afforded by New Mexico's Equal Rights Amendment in the situation where the Department has elected to provide medical assistance to needy persons in this state.

## I.

{4} We begin with a review of the factual and legal developments that led to this appeal. For many years, both federal and state law have provided funding for persons to obtain medical assistance when they meet certain criteria based on financial and medical need. At the federal level, Title XIX of the Social Security Amendments of 1965, 42 U.S.C. §§ 1396 to 1396v (1994 & Supp. II 1996), establishes a program, commonly known as "Medicaid," for the purpose of providing federal financial assistance to states that choose to participate. Under the program, the federal government pays a percentage of the total cost that a participating state incurs in providing certain categories of medical care and services to needy persons. *See* 42 U.S.C. § 1396b(a), 1396d(b)(1). While a state's medical assistance plan must contain a number of required elements in order to qualify for federal funding, *see Hern v. Beye,* 57 F.3d 906, 910 (10th Cir.1995), "Title XIX does not obligate a participating State to pay for those medical services for which federal reimbursement is unavailable," *Harris v. McRae,* 448 U.S. 297, 309, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980).

{5} Except in cases of rape or incest, or when necessary to save the life of the mother, abortions are among the medical services for which federal funding is unavailable under a provision of federal law known as "the Hyde Amendment." *See* Departments of Labor, Health and Human Services, and Education, and Related Agencies Appropriations Act of 1995, Pub.L. No. 103–333, § 509, 108 Stat. 2539, 2573 (1994).[1] However, "[a] participating State is free, if it so chooses, to include in its Medicaid plan those medically necessary abortions for which federal reimbursement is unavailable." *Harris,* 448 U.S. at 311 n. 16, 100 S.Ct. 2671.

{6} Section 27–2–12 of New Mexico's Public Assistance Act, NMSA 1978, § 27–2–12 (1993), authorizes the Medical Assistance Division of the Human Services Department to issue regulations regarding the provision of medical assistance to persons eligible for public assistance programs under the federal Social Security Act. Pursuant to Section 27–2–12, the Department issued a rule, known as "Rule 766," that restricted the availability of abortions under the State's medical assistance plan. In response to concerns about its constitutionality, the Department revised Rule 766 in 1994 to expand the availability of abortions under the State's medical assistance plan. The revised rule allowed the use of state funds to provide abortions for Medicaid-eligible women when they are medically necessary. *See* Pregnancy Termination Procedures, N.M. Human Servs. Dep't, Med. Assistance Div. Reg. 766, 5 N.M.Reg. 1632 (Dec. 15, 1994, prior to 1995 amendment). The 1994 rule defined an abortion as "medically necessary" when a pregnancy "aggravates a pre-existing condition, makes treatment of a condition impossible, interferes with or hampers a diagnosis, or has a profound negative impact upon the physical or mental health of an individual." *Id.* Under the 1994 rule, abortions for Medicaid recipients that met this definition of "medically necessary" but did not fit into the exceptions of the Hyde Amendment were paid for exclusively with state funds.

{7} After a new Secretary was appointed, the Department made another revision of

---

1. We note that the Hyde Amendment is not "permanent legislation" but rather part of a statute appropriating funds for certain departments of the federal government for one fiscal year. *See Dalton v. Little Rock Family Planning Servs.,* 516 U.S. 474, 477, 116 S.Ct. 1063, 134 L.Ed.2d 115 (1996) (per curiam). However, all versions of the Hyde Amendment subsequent to the district court's order have retained essentially the same restrictions. *See* Omnibus Consolidated Rescis-sions and Appropriations Act of 1996, Pub.L. No. 104–134, § 508, 110 Stat. 1321, 1321–243 (1996); Omnibus Consolidated Appropriations Act of 1997, Pub.L. No. 104–208, § 508, 110 Stat. 3009, 3009-269 (1996); Balanced Budget Act of 1997, Pub.L. No. 105–33, § 2105(c)(1), (7), 111 Stat. 251, 561, 562–63 (1997). The question of the temporal scope of the district court's order is not before us.

Rule 766 that was scheduled to take effect in May 1995. The 1995 rule restricted state funding of abortions under the Department's medical assistance program to those certified by a physician as necessary to save the life of the mother or to end an ectopic pregnancy, or when the pregnancy resulted from rape or incest. *See* Pregnancy Termination Procedures, N.M. Human Serv. Dep't, Med. Assistance Div. Reg., 6 N.M.Reg. 684 (Apr. 29, 1995) (codified at 8 NMAC 4.MAD.766 (May 1, 1995)).[2] On April 21, 1995, however, Plaintiffs brought suit in the district court to prevent the 1995 revision of Rule 766 from taking effect.

{8} Plaintiffs' complaint alleged that Rule 766 violates the rights of Medicaid-eligible women under Article II, Sections 4 and 18 of the New Mexico Constitution. The Department denied these allegations. Eugene E. Klecan filed a motion, in which Donald Schaurete later joined, to intervene as of right as a taxpayer and representative of the potential life of the unborn. The district court granted the motion to intervene. The Attorney General declined to represent the Department and was later allowed to present arguments as an amicus curiae.

{9} On May 1, 1995, the district court granted a preliminary injunction to keep the 1995 revision of Rule 766 from taking effect. Both Plaintiffs and the Department subsequently filed motions for summary judgment and entered stipulations of fact. On July 3, 1995, the district court issued a memorandum opinion concluding that the 1995 revision of Rule 766 violates Article II, Section 18 of the New Mexico Constitution. On this basis, the district court granted Plaintiffs' motion for summary judgment and made the injunction permanent. The Department appealed this ruling. Klecan and Schaurete also appealed. Plaintiffs cross-appealed the orders allowing Klecan and Schaurete to intervene.[3] On October 13, 1995, the Court of Appeals certified the appeals to this Court.

## II.

{10} The parties raise several threshold questions that we must answer before turning to the merits of the district court's ruling. First, the Department challenges Plaintiffs' standing to assert a claim on behalf of pregnant women who seek medically necessary abortions under the State's medical assistance program. Second, Plaintiffs challenge the district court rulings that allowed Klecan and Schaurete to intervene as of right in this case. Third, Klecan and Schaurete assert that Plaintiffs' claims must be dismissed because the doctrine of sovereign immunity bars them from bringing suit against the Department. Finally, the Department asserts that the district court's order granting Plaintiff's motion for summary judgment was improper because there are disputed issues of material fact.

## A.

{11} Plaintiffs Curtis Boyd, M.D., Lucia Cies, M.D., Bruce Ferguson, M.D., and Lewis H. Koplik, M.D., are individual physicians who provide reproductive health care services, including abortions, to Medicaid-eligible women. Plaintiff Abortion and Reproductive Health Services is a non-profit organization that also provides such services. Plaintiff Planned Parenthood of the Rio Grande is a non-profit organization that provides counseling and referral on pregnancy options, including abortion, and loans funds for abortions to Medicaid-eligible women. Plaintiff New Mexico Right to Choose/NARAL is a non-profit advocacy organization with members who are Medicaid-eligible women. The Department contends that Plaintiffs do not have standing to bring this lawsuit because none of them are Medicaid-eligible women who seek a medically necessary abortion and were denied it due to Rule 766.

{12} In order to obtain standing for judicial review in New Mexico, litigants gen-

---

**2.** For ease of reference, all subsequent citations to the New Mexico Human Services Department Rules are to the New Mexico Administrative Code as amended through May 1, 1995, unless otherwise noted.

**3.** Plaintiffs also cross-appealed the district court's refusal to award attorney fees. However, this Court granted a stay of the cross-appeal regarding Plaintiffs' attorney fees pending the disposition of the other issues. We do not address the issue of attorney fees in this opinion.

erally must allege that they are directly injured as a result of the action they seek to challenge in court. *See De Vargas Sav. & Loan Ass'n v. Campbell*, 87 N.M. 469, 472, 535 P.2d 1320, 1323 (1975); *Ramirez v. City of Santa Fe*, 115 N.M. 417, 420, 852 P.2d 690, 693 (Ct.App.1993); *cf. City of Las Cruces v. El Paso Elec. Co.*, 1998–NMSC–006, ¶ 16, 124 N.M. 640, 954 P.2d 72 (noting prerequisites of "actual controversy" in declaratory judgment actions). Following the trend in federal standing law articulated in *Sierra Club v. Morton*, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972), and *United States v. SCRAP*, 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973), however, this requirement is met even when the extent of the alleged injury is slight, *see Ramirez*, 115 N.M. at 420, 852 P.2d at 693, or the allegation is made by an organization on behalf of its members, *see National Trust for Historic Preservation v. City of Albuquerque*, 117 N.M. 590, 594, 874 P.2d 798, 802 (Ct.App. 1994). Moreover, New Mexico state courts are not subject to the jurisdictional limitations imposed on federal courts by Article III, Section 2 of the United States Constitution. *See John Does I Through III v. Roman Catholic Church of the Archdiocese of Santa Fe, Inc.*, 1996–NMCA–094, ¶¶ 25–26, 122 N.M. 307, 924 P.2d 273; *cf. State ex rel. Clark v. Johnson*, 120 N.M. 562, 569, 904 P.2d 11, 18 (1995) (concluding that it is within this Court's discretion to confer standing " 'on the basis of the importance of the public issues involved.' " (quoting *State ex rel. Sego v. Kirkpatrick*, 86 N.M. 359, 363, 524 P.2d 975, 979 (1974))).

■ {13} Nevertheless, the exercise of this Court's discretion to confer standing should be guided by prudential considerations, particularly when litigants seek to assert claims on behalf of third parties. *Cf. John Does I Through III*, 1996–NMCA–094, ¶ 25, 122 N.M. 307, 924 P.2d 273 ("The requirements for standing derive from constitutional provisions, enacted statutes and rules, and prudential considerations."). Under federal standing law, courts consider the following three criteria in determining the right of litigants to bring actions on behalf of third parties:

The litigant must have suffered an "injury in fact," thus giving him or her a "sufficiently concrete interest" in the outcome of the issue in dispute; the litigant must have a close relation to the third party; and there must exist some hindrance to the third party's ability to protect his or her own interests.

*Powers v. Ohio*, 499 U.S. 400, 411, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991) (citations omitted); *see also Singleton v. Wulff*, 428 U.S. 106, 112–16, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976) (plurality opinion); *Craig v. Boren*, 429 U.S. 190, 192–97, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976). These three criteria, as applied by the plurality in *Singleton*, 428 U.S. at 112–18, 96 S.Ct. 2868, warrant our consideration in this case.

{14} Insofar as they are providers of abortion services to Medicaid-eligible women, Plaintiffs have both a direct financial interest in obtaining state funding to reimburse them for the cost of these services, *see id.* at 112–13, 96 S.Ct. 2868, and a close relation to the Medicaid-eligible women whose rights they seek to assert in court, *see id.* at 117, 96 S.Ct. 2868. Insofar as Plaintiff New Mexico Right to Choose/NARAL seeks to assert the rights of its members who are Medicaid-eligible women, this organization also has a sufficiently direct interest and a sufficiently close relationship. *Cf. National Trust for Historic Preservation*, 117 N.M. at 594, 874 P.2d at 802 (organization may assert claim on behalf of its members). Further, we agree with the plurality in *Singleton*, 428 U.S. at 117–18, 96 S.Ct. 2868, that privacy concerns and time constraints impose a significant hindrance on the ability of Medicaid-eligible women to protect their own interest in obtaining medically necessary abortions. For all of these reasons, we determine that Plaintiffs have standing to challenge the constitutionality of Rule 766 in this case.

**B.**

{15} In the district court, Klecan and Schaurete moved to intervene as of right under Rule 1–024(A) NMRA 1998. They did not assert a statutory right to intervene under Rule 1–024(A)(1), nor did they seek permissive intervention under Rule 1–024(B).

Thus, we must determine whether the district court applied the correct legal standard in granting the motion to intervene under Rule 1–024(A)(2). *Cf. State v. Elinski,* 1997–NMCA–117, ¶ 8, 124 N.M. 261, 948 P.2d 1209 (providing for de novo review of a discretionary decision that is premised on misapprehension of the law).

{16} Under Rule 1–024(A)(2), anyone who makes a timely application shall be permitted to intervene

> when the applicant claims an interest relating to the property or transaction which is the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.

Plaintiffs contend that Klecan and Schaurete's asserted interest as taxpayers and protectors of the potential life of the unborn is not sufficient to meet this standard. We agree with Plaintiffs that Klecan and Schaurete fail to meet the requirements of Rule 1–024(A)(2).

{17} Rule 1–024(A)(2) requires a person claiming a right of intervention to demonstrate an interest in the action "that is significant, direct rather than contingent, and based on a right belonging to the proposed intervenor rather than [to] an existing party to the suit." *Cordova v. State ex rel. Human Servs. Dep't (In re Marcia L.),* 109 N.M. 420, 421, 785 P.2d 1039, 1040 (Ct.App.1989). In this respect, the requirements for intervention as of right seem to accord with the general requirements for standing. *Cf.* Rule 1–082 NMRA 1998 (rules of civil procedure shall not be construed to extend court's jurisdiction); *In re Marcia L.,* 109 N.M. at 421, 785 P.2d at 1040 (noting that Rule 1–024(A) "is almost identical to [Fed.R.Civ.P.] 24(a)"); 6 James Wm. Moore et al., *Moore's Federal Practice* § 24.03[2][d], at 24–37 (3d ed.1998) (advocating the view that a party who lacks standing cannot intervene under Fed. R.Civ.P. 24(a)). However, while we may confer standing to decide an issue of great public importance, *see State ex rel. Clark,* 120 N.M. at 569, 904 P.2d at 18, this power to confer

standing " 'does not equate with rights of indiscriminate intervention.' The bounds of [Rule 1–024] are to be observed." *Dominguez v. Rogers,* 100 N.M. 605, 608, 673 P.2d 1338, 1341 (Ct.App.1983) (quoting *Peterson v. United States,* 41 F.R.D. 131, 135 (D.Minn. 1966) (mem.)).

{18} In this case, Klecan and Schaurete assert that their interests as taxpayers will be harmed by the expenditure of state funds for medically necessary abortions. However, they have not alleged that such an expenditure will change their tax liability in any way, or that any of their tax payments are earmarked for the purpose of paying for abortions. Thus, we conclude that Klecan and Schaurete's interest as taxpayers is not sufficiently direct to meet the requirements of Rule 1–024(A)(2). *See In re Marcia L.,* 109 N.M. at 421, 785 P.2d at 1040; *cf. Eastham v. Public Employees' Retirement Ass'n Bd.,* 89 N.M. 399, 405, 553 P.2d 679, 685 (1976) (concluding that taxpayers lack standing when they fail to demonstrate that they " 'will be affected by the acts sought to be enjoined in any other manner than any other taxpayer of the state' " (quoting *Asplund v. Hannett,* 31 N.M. 641, 645, 249 P. 1074, 1075 (1926))). As such, Klecan and Schaurete's asserted interest as taxpayers does not entitle them to intervene as a matter of right in this case.

{19} With regard to Klecan and Schaurete's alleged interest as representatives of the potential life of the unborn, we conclude that interest is adequately protected by the Department in this case. "Where the State ... is named as a party to an action and the interest the applicant seeks to protect is represented by a governmental entity, a presumption of adequate representation exists ." *Chino Mines Co. v. Del Curto,* 114 N.M. 521, 524, 842 P.2d 738, 741 (Ct.App. 1992); *see also Planned Parenthood League of Mass., Inc. v. Attorney General,* 424 Mass. 586, 677 N.E.2d 101, 109 (Mass.1997); 6 Moore et al., *supra,* § 24.03[4][a][iv][A], at 24–46.1 to 24–46.2; *cf. In re Marcia L.,* 109 N.M. at 421, 785 P.2d at 1040 (intervention under Rule 1–024(A) must be "based on a right belonging to the proposed intervenor rather than [to] an existing party to the

suit"). Thus, to the extent that the interest in the potential life of the unborn requires legal representation in this case, the Department is presumed to represent that interest adequately.

{20} To overcome this presumption, the proposed intervenors must demonstrate that the representation is inadequate by showing, for example, an adversity of interest, collusion, or nonfeasance on the part of the Department. *See Chino Mines Co.*, 114 N.M. at 524, 842 P.2d at 741; 6 Moore et al., *supra*, § 24.03[4][a][ii], at 24–45. In this case, Klecan, Schaurete, and the Department share the same ultimate objective—upholding the constitutionality of Rule 766. While the record indicates that there may have been some difference of opinion about the tactics used to accomplish this objective, such differences are insufficient to establish an adversity of interest. *See Planned Parenthood League*, 677 N.E.2d at 109; 6 Moore et al., *supra*, § 24.03[4][a][iii], at 24–45. Further, the fact that the Attorney General chose to support the Plaintiffs' position as an amicus curiae does not show collusion or nonfeasance on the part of the Department. The record shows that the Department was provided with independent and adequate representation notwithstanding the Attorney General's position in this case.

{21} For these reasons, the proposed intervenor's "assertion of an interest in the protection of 'unborn' children is also insufficient to justify intervention as of right." *Keith v. Daley*, 764 F.2d 1265, 1271 (7th Cir.1985); *cf. Dominguez*, 100 N.M. at 608, 673 P.2d at 1341 (rejecting a father's application to intervene as of right in an action for wrongful death of his daughter where the father's interest was represented by a duly appointed personal representative and the father failed to show that representation was inadequate). We conclude that the district court's decision to grant the motion to intervene as of right requires reversal "because it was premised on a misapprehension of the law." *Elinski*, 1997–NMCA–117, ¶ 8, 124 N.M. 261, 948 P.2d 1209.

{22} Because we reverse on this issue, we need not reach the question of whether Klecan and Schaurete were denied due pro-

cess after the district court erroneously granted their motion to intervene. In light of the public importance of the other constitutional issues presented in this case, however, we consider Klecan and Schaurete's other arguments as if they were presented by an amicus curiae. *Cf.* 6 Moore et al., *supra*, § 24.03[2][b], at 24–29 ("[A]pplicants concerned only about the legal principles that apply to an action may appear as amici curiae, but they are not entitled to intervene as of right.").

## C.

{23} Klecan and Schaurete assert that Plaintiffs' complaint must be dismissed because the Department is not subject to suit in this matter. Section 44–6–13 of the Declaratory Judgment Act, NMSA 1978, § 44–6–13 (1975), however, plainly states that "the state of New Mexico, or any official thereof, may be sued and declaratory judgment entered when the rights ... of the parties call for a construction of the constitution of the state of New Mexico." Further, we have heard other claims against the Department that challenge the constitutionality of its public assistance programs, *see, e.g., Howell v. Heim*, 118 N.M. 500, 882 P.2d 541 (1994); *cf. Katz v. New Mexico Dep't of Human Servs., Income Support Div.*, 95 N.M. 530, 624 P.2d 39 (1981) (appeal of administrative ruling), and in this case, the Department admitted the jurisdictional allegations in Plaintiffs' complaint. Therefore, sovereign immunity does not shield the Department from appearing in court as a defendant in this case.

## D.

{24} "Summary judgment is proper if there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law." *Roth v. Thompson*, 113 N.M. 331, 334, 825 P.2d 1241, 1244 (1992); *see also* Rule 1–056(C) NMRA 1998. On appeal, the Department contends that the district court erred in entering summary judgment in Plaintiff's favor because there are genuine issues of material fact. In the district court, however, the Department filed its own motion for summary judgment,

and also stipulated that "the[ ] parties agree that based upon this record, this case is ripe for determination by summary judgment." In addition, the parties filed a lengthy set of stipulated facts. While some disputed facts not covered by these stipulations may remain, they do not preclude summary judgment without a showing that they are material. *See Tapia v. Springer Transfer Co.,* 106 N.M. 461, 463, 744 P.2d 1264, 1266 (Ct.App. 1987). The Department made no such showing here. *Cf. Spectron Dev. Lab. v. American Hollow Boring Co.,* 1997–NMCA–025, ¶ 32, 123 N.M. 170, 936 P.2d 852 (concluding that normal rules of preservation of error apply to appeals from summary judgments). Therefore, this issue does not provide a basis for reversal of the district court's order, and none of the threshold issues raised by the parties preclude this Court from ruling on the constitutionality of Rule 766.

## III.

{25} We next address the merits of Plaintiffs' constitutional claims. Plaintiffs concede that the United States Constitution does not require the State to provide funding to Medicaid-eligible women for medically necessary abortions that fall outside the restrictions of the Hyde Amendment. *See Harris,* 448 U.S. at 316, 100 S.Ct. 2671. Plaintiffs' arguments in the district court and on appeal are directed to the issue of whether the New Mexico Constitution affords greater protection than federal law. This issue was preserved below. *See State v. Gomez,* 1997–NMSC–006, ¶¶ 22, 23, 122 N.M. 777, 932 P.2d 1 (requirements for preserving state constitutional issue when parallel provision of federal constitution is involved); *cf. State v. Sarracino,* 1998–NMSC–022, ¶ 11, 125 N.M. 511, 964 P.2d 72 (discussing preservation when there is no federal constitutional scheme from which to depart).

{26} At least twelve other state courts have published opinions addressing the question of whether state law requires funding for abortions for indigent women in situations where federal reimbursement is unavailable. In six of these states, the courts have determined that such funding is required under their state constitutions. *See*

*Committee to Defend Reprod. Rights v. Myers,* 29 Cal.3d 252, 172 Cal.Rptr. 866, 625 P.2d 779, 798–99 (1981); *Doe v. Maher,* 40 Conn.Supp. 394, 515 A.2d 134, 162 (Super.Ct.1986); *Moe v. Secretary of Admin. and Fin.,* 382 Mass. 629, 417 N.E.2d 387, 404 (1981); *Women of Minn. v. Gomez,* 542 N.W.2d 17, 32 (Minn.1995); *Right to Choose v. Byrne,* 91 N.J. 287, 450 A.2d 925, 941 (1982); *Women's Health Ctr. of W. Va., Inc. v. Panepinto,* 191 W.Va. 436, 446 S.E.2d 658, 667 (1993). One court found that a state agency exceeded its statutory authority in restricting state funding for abortions. *See Planned Parenthood Ass'n, Inc. v. Department of Human Resources,* 297 Or. 562, 687 P.2d 785, 792–93 (1984). Another court expressed disapproval of an agency rule restricting state funding for abortions in an opinion holding that a trial court abused its discretion in denying an award of attorney fees to plaintiffs who prevailed in their challenge to such restrictions. *See Roe v. Harris,* 128 Idaho 569, 917 P.2d 403, 407 (1996). In four of the twelve states that have published opinions on the issue, however, the courts have not found provisions in their state constitutions that require state funding for abortions in situations where federal reimbursement is unavailable. *See Doe v. Department of Social Servs.,* 439 Mich. 650, 487 N.W.2d 166, 179–80 (1992); *Hope v. Perales,* 83 N.Y.2d 563, 611 N.Y.S.2d 811, 634 N.E.2d 183, 188 (1994); *Rosie J. v. North Carolina Dep't of Human Resources,* 347 N.C. 247, 491 S.E.2d 535, 538 (1997); *Fischer v. Department of Pub. Welfare,* 509 Pa. 293, 502 A.2d 114, 126 (1985). Only two of the published opinions addressing the issue have analyzed whether state funding for abortions is required by a state's equal rights amendment, with conflicting results. *Compare Doe,* 515 A.2d at 162 (concluding that funding restrictions violate Connecticut's equal rights amendment), *with Fischer,* 502 A.2d at 126 (concluding that funding restrictions do not violate Pennsylvania's equal rights amendment).

{27} Our analysis focuses on the protection afforded by the Equal Rights Amendment to Article II, Section 18 of the New Mexico Constitution in the situation where the Department has elected to provide medical assistance to needy persons. We first

examine whether this provision of our state constitution establishes a basis for affording Medicaid-eligible women greater protection against gender discrimination than they receive under federal law. We conclude that it does. Next, we address the Department's claim that Rule 766 does not warrant heightened judicial scrutiny because it is based on a physical characteristic unique to one sex, namely the ability to become pregnant and bear children. We conclude that this unique physical characteristic does not exempt Rule 766 from a searching judicial inquiry under New Mexico's Equal Rights Amendment. We then examine whether Rule 766 operates to the disadvantage of women in the context of the State's Medicaid program, and we determine that Rule 766 is presumptively unconstitutional because it results in a program that does not apply the same standard of medical necessity to both men and women. Finally, we examine whether there is a compelling justification for treating men and women differently with respect to their eligibility for medical assistance in this instance. Because such a compelling justification is lacking in this case, we conclude that Rule 766 violates the New Mexico Constitution.

### A.

{28} Neither the Hyde Amendment nor the federal authorities upholding the constitutionality of that amendment bar this Court from affording greater protection of the rights of Medicaid-eligible women under our state constitution in this instance. *See Gomez*, 1997–NMSC–006, ¶ 17, 122 N.M. 777, 932 P.2d 1; *Harris*, 448 U.S. at 311 n. 16, 100 S.Ct. 2671. Under this Court's "interstitial approach" to state constitutional interpretation, we "may diverge from federal precedent for three reasons: a flawed federal analysis, structural differences between state and federal government, or distinctive state characteristics." *Gomez*, 1997–NMSC–006, ¶ 19, 122 N.M. 777, 932 P.2d 1; *see also State v. Gutierrez*, 116 N.M. 431, 440, 863 P.2d 1052, 1061 (1993) (describing this Court's "willingness to undertake independent analysis of our state constitutional guarantees when federal law begins to encroach on the sanctity of those guarantees"). In this case, we find distinctive state characteristics that render the federal equal-protection analysis inapposite with respect to Plaintiffs' claim of gender discrimination.

{29} Article II, Section 18 of the New Mexico Constitution guarantees that "[e]quality of rights under law shall not be denied on account of the sex of any person." This guarantee became part of our state constitution in 1973, after the people of New Mexico passed the Equal Rights Amendment by an overwhelming margin. *See* Richard H. Folmar, *Piecemeal Amendment of the New Mexico Constitution: 1911 to 1990,* at 28 tbl. I, 34 tbl. IV (13th rev., New Mexico Legis. Council Serv., 1991). There is no counterpart to New Mexico's Equal Rights Amendment in the United States Constitution. Indeed, the absence of such an amendment to the United States Constitution appears to have been a significant factor in the development of federal law applying the Equal Protection Clause to gender discrimination claims. *See Frontiero v. Richardson,* 411 U.S. 677, 692, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973) (Powell, J., concurring in the judgment) (pending ratification process for federal equal rights amendment provides "reason for deferring a general categorizing of sex classifications as invoking the strictest test of judicial scrutiny"); *People v. Ellis,* 57 Ill.2d 127, 311 N.E.2d 98, 101 (1974) (noting relationship between *Frontiero* and equal rights amendment). This lack of a federal counterpart to New Mexico's Equal Rights Amendment renders the federal equal protection analysis inapposite in this case.

{30} Prior to 1973, Article II, Section 18 of the New Mexico Constitution contained only the following sentence: "No person shall be deprived of life, liberty or property without due process of law; nor shall any person be denied equal protection of the laws." The Equal Rights Amendment added a new sentence to this provision of our state constitution: "Equality of rights under law shall not be denied on account of the sex of any person." We construe the intent of this amendment as providing something beyond that already afforded by the general language of the Equal Protection Clause. *See Doe,* 515 A.2d at 160–61 ("To equate our [equal rights amendment] with the equal pro-

tection clause of the federal constitution would negate its meaning given that our state adopted an [equal rights amendment] while the federal government failed to do so."); *Ellis*, 311 N.E.2d at 101 ("[W]e find inescapable the conclusion that [our equal rights amendment] was intended to supplement and expand the guaranties of the equal protection provision of the Bill of Rights[.]"); *Darrin v. Gould*, 85 Wash.2d 859, 540 P.2d 882, 889 (1975) (en banc) ("Any other view would mean the people intended to accomplish no change in the existing constitutional law governing sex discrimination" when they enacted an equal rights amendment); *cf. Hannett v. Jones*, 104 N.M, 392, 395, 722 P.2d 643, 646 (1986) ("[C]onstitutions must be construed so that no part is rendered surplusage or superfluous[.]").

{31} We do not base our analysis on a mere textual difference between the federal and state constitutions. *Cf. Gomez*, 1997–NMSC–006, ¶ 17, 122 N.M. 777, 932 P.2d 1 (indicating that textual differences are not necessary prerequisites to affording broader protection under the New Mexico Constitution (citing *State ex rel. Serna v. Hodges*, 89 N.M. 351, 356, 552 P.2d 787, 792 (1976))). Rather, we view New Mexico's Equal Rights Amendment as the culmination of a series of state constitutional amendments that reflect an evolving concept of gender equality in this state. A review of the history of these amendments informs our analysis.

{32} From its inception, our state constitution has recognized that "[a]ll persons are born equally free." N.M. Const. art. II, § 4. The provisions in our state constitution prohibiting discrimination on account of sex, however, have developed in a piecemeal fashion. At the time the New Mexico Constitution was drafted in 1910, the rights of women to vote and participate in public life were a topic of debate and compromise. *See* Reuben W. Heflin, *New Mexico Constitutional Convention*, 21 N.M.Hist.Rev. 60, 67 (1946); Edward D. Tittmann, *New Mexico Constitutional Convention: Recollections*, 27 N.M.Hist.Rev. 177, 182 (1952). While Congress only extended the right to vote and hold public office to "every free white male inhabitant" when it established the Territory

of New Mexico in 1850, *see* Organic Act Establishing the Territory of New Mexico, ch. 49, § 6, 9 Stat. 446, 449 (1850) (compiled in NMSA 1978, vol. 1, Territorial Laws and Treaties), in 1914 this Court noted that the territorial government had appointed women to hold various public offices, *see State v. Chaves de Armijo*, 18 N.M. 646, 663–64, 140 P. 1123, 1129 (1914). In addition, "[t]he Supreme Court of the Territory, in 1908, admitted a woman to practice law in the Territory, and [circa 1889] a woman was admitted to the bar at Las Vegas." *Id.* at 663, 140 P. at 1129.

{33} The original state constitution that became law in 1912, however, only gave women the right to vote in school elections and to hold the office of county school superintendent, school director, board of education member, notary public, and "such other appointive offices as may be provided by law." N.M. Const. art. XX, § 11; *id.* art. VII, § 2 (prior to 1921 amendment). In 1913, the Legislature provided that "women may hold any appointive office in the State of New Mexico." 1913 N.M.Laws, ch. 60. Following the passage of the Nineteenth Amendment to the United States Constitution, which gave women the unconditional right to vote in federal and state elections, Article VII, Section 2 of the New Mexico Constitution was amended in 1921 to state that "[t]he right to hold public office in New Mexico shall not be denied or abridged on account of sex, and wherever the masculine gender is used in this constitution, in defining the qualifications for specific offices, it shall be construed to include the feminine gender." *See* Folmar, *supra*, at 22 tbl. I.

{34} Despite these developments, many of the State's early laws continued to reflect the common-law view "that women were incapable mentally of exercising judgment and discretion and were classed with children, lunatics, idiots, and aliens insofar as their political rights were concerned." *Chaves de Armijo*, 18 N.M. at 659, 140 P. at 1127; *see also* Anne K. Bingaman, *The Effects of an Equal Rights Amendment on the New Mexico System of Community Property: Problems of Characterization, Management and Control*, 3 N.M.L.Rev. 11, 56 (1973) (noting

early community property laws that "reflect[ed] the attitudes of an era when married women were expected to rear children, care for home and husband, and do nothing else"). For example, the State's early marriage laws provided that "[t]he husband is the head of the family. He may choose any reasonable place or mode of living, and the wife must conform thereto." NMSA 1953, § 57–2–2 (1907) (repealed 1973); *see also* NMSA 1953, § 57–4–3 (1927) (repealed 1973) (granting husbands the exclusive right to manage and control personal property shared by their wives under the state's community property laws).

{35} Many of these early laws were repealed or amended in direct response to the passage of the Equal Rights Amendment in 1972. *See, e.g.,* 1973 N.M.Laws, ch. 58, § 1 (revising the definition of "unlawful discriminatory practice" under the New Mexico Human Rights Act, NMSA 1978, § 28–1–7 (1995), to expand prohibitions on sex discrimination); Anne K. Bingaman, *The Community Property Act of 1973: A Commentary and Quasi–Legislative History,* 5 N.M.L.Rev. 1 (1974) (reviewing changes in community property law occasioned by passage of the Equal Rights Amendment); Folmar, *supra,* at 28 tbl. I (noting that Article VIII, Section 5 of the New Mexico Constitution was amended in 1973 to remove gender-based restrictions on veterans' property tax exemptions); Lisa Dawgert Waggoner, *New Mexico Joins the Twentieth Century: The Repeal of the Marital Rape Exemption,* 22 N.M.L.Rev. 551, 561 (1992) (describing changes to the definition of criminal sexual offenses in response to the Equal Rights Amendment). New Mexico courts also have relied upon the Equal Rights Amendment and the statutory changes that followed in its wake. *See, e.g., State v. Gonzales,* 111 N.M. 590, 599, 808 P.2d 40, 49 (Ct.App.1991) (Equal Rights Amendment makes it "clear beyond cavil that discrimination on the basis of gender in the use of peremptory challenges [to strike jurors in a criminal case] is prohibited in New Mexico"); *Behrmann v. Phototron Corp.,* 110 N.M. 323, 328, 795 P.2d 1015, 1020 (1990) (affirming a jury verdict in favor of an employee who claimed that termination of her employment because of her

pregnancy was an unlawful discriminatory practice under Section 28–1–7).

{36} Based on our review of the text and history of our state constitution, we conclude that New Mexico's Equal Rights Amendment is a specific prohibition that provides a legal remedy for the invidious consequences of the gender-based discrimination that prevailed under the common law and civil law traditions that preceded it. As such, the Equal Rights Amendment requires a searching judicial inquiry concerning state laws that employ gender-based classifications. This inquiry must begin from the premise that such classifications are presumptively unconstitutional, and it is the State's burden to rebut this presumption.

{37} Although we recognize that federal courts currently apply an intermediate level of scrutiny to gender-based classifications, *see United States v. Virginia,* 518 U.S. 515, 532–34, 116 S.Ct. 2264, 135 L.Ed.2d 735 (1996), our rationale for conducting a searching judicial inquiry regarding such classifications under the New Mexico Constitution may accord with the criteria for invoking more stringent judicial scrutiny under federal law, *see United States v. Carolene Prods. Co.,* 304 U.S. 144, 152–53 n. 4, 58 S.Ct. 778, 82 L.Ed. 1234 (1938) (noting that heightened scrutiny may be appropriate "when legislation appears on its face to be within a specific prohibition of the Constitution"); *San Antonio Indep. Sch. Dist. v. Rodriguez,* 411 U.S. 1, 28, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973) ("history of purposeful unequal treatment" is one of "traditional indicia" of suspect classification requiring strict scrutiny under federal law); *Marrujo v. New Mexico State Highway Transp. Dep't,* 118 N.M. 753, 757, 887 P.2d 747, 751 (1994) (noting circumstances in which strict scrutiny applies); *cf. Opinion of the Justices to the House of Representatives,* 374 Mass. 836, 371 N.E.2d 426, 428 (1977) ("To use a standard ... which requires any less than the strict scrutiny test would negate the purpose of the equal rights amendment and the intention of the people in adopting it."). Thus, as we explain below, our analysis is not inextricably tied to the standard of review employed by the federal courts. *Cf. Gutierrez,* 116 N.M. at 435–36,

863 P.2d at 1056–57 (in interpreting state constitutional guarantees, New Mexico courts may seek guidance from decisions of federal courts without being bound by those decisions).

## B.

{38} The Department asserts that heightened scrutiny is not warranted in this case because Rule 766 employs a classification based on a "physical condition" with respect to which men and women are not similarly situated. *See Geduldig v. Aiello,* 417 U.S. 484, 496–97 n. 20, 94 S.Ct. 2485, 41 L.Ed.2d 256 (1974); *Fischer,* 502 A.2d at 125–26. We agree that not all classifications based on physical characteristics unique to one sex are instances of invidious discrimination. A flat prohibition of such classifications may lead to "absurd results." *See generally* Barbara A. Brown et al., *The Equal Rights Amendment: A Constitutional Basis for Equal Rights for Women,* 80 Yale L.J. 871, 893–94 (1971); Ruth Bader Ginsburg, *Gender and the Constitution,* 44 Univ.Cin.L.Rev. 1, 37 (1975). For this reason, the presumption that gender-based classifications violate New Mexico's Equal Rights Amendment is not irrebuttable, and our heightened scrutiny need not be "fatal in fact." *Cf. Virginia,* 518 U.S. at 533 n. 6, 116 S.Ct. 2264 (observing that "strict scrutiny of [classifications based on race or national origin] is not inevitably 'fatal in fact' ").

{39} It would be error, however, to conclude that men and women are not similarly situated with respect to a classification simply because the classifying trait is a physical condition unique to one sex. In this context, " 'similarly situated' cannot mean simply 'similar in the possession of the classifying trait.' All members of any class are similarly situated in this respect and consequently, any classification whatsoever would be reasonable by this test." Joseph Tussman & Jacobus tenBroek, *The Equal Protection of the Laws,* 37 Cal.L.Rev. 341, 345 (1949). It is equally erroneous to rely on the notion that a classification based on a unique physical characteristic is reasonable simply because it corresponds to some "natural" grouping. *See id.* at 346. We find this error

present in an analysis which reasons that laws affecting only the members of one sex may be justified by "certain immutable facts of life which no amount of legislation may change." *Fischer,* 502 A.2d at 125.

{40} To determine whether men and women are similarly situated with respect to a classification, "we must look beyond the classification to the purpose of the law." Tussman & tenBroek, *supra,* at 346. Further, to determine whether a classification based on a physical characteristic unique to one sex results in the denial of "equality of rights under law" within the meaning of New Mexico's Equal Rights Amendment, we must ascertain whether the classification "operates to the disadvantage of persons so classified." Ginsburg, *supra,* at 37–38; *see also* Brown et al., *supra,* at 894 (noting danger that rule based on unique physical characteristic "could be used to justify laws that in overall effect seriously discriminate against one sex"); Cass R. Sunstein, *Neutrality in Constitutional Law (with Special Reference to Pornography, Abortion, and Surrogacy),* 92 Colum.L.Rev. 1, 33 (1992) ("The question at hand is whether government has the power to turn th[e] capacity [to bear children], limited as it is to one gender, into a source of social disadvantage."); Laurence H. Tribe, *American Constitutional Law* § 16–29, at 1584 (2d ed. 1988) ("[T]he fundamental problem is [the] willingness to transmute woman's 'real' biological difference to woman's disadvantage.").

{41} In making these determinations, we cannot ignore the fact that "[s]ince time immemorial, women's biology and ability to bear children have been used as a basis for discrimination against them." *Doe,* 515 A.2d at 159. Further, history teaches that lawmakers often have attempted to justify gender-based discrimination on the grounds that it is "benign" or "protective" of women. *See generally* Ginsburg, *supra,* at 2–7; *cf. Frontiero,* 411 U.S. at 684, 93 S.Ct. 1764 (plurality opinion) (discussing "attitude of 'romantic paternalism' "). For example, as a basis for imposing restrictions on women's ability to work and participate in public life, courts have accepted at face value a desire of lawmakers to protect women from "ugliness and

depravity," *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 132, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994), "a legislative solicitude for the moral and physical well-being of women," *Goesaert v. Cleary*, 335 U.S. 464, 468, 69 S.Ct. 198, 93 L.Ed. 163 (1948) (Rutledge, J., dissenting), *overruling recognized by Payne v. Tennessee*, 501 U.S. 808, 828 n. 1, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991), including the need to protect a woman's "physical structure and a proper discharge of her maternal functions," *Muller v. Oregon*, 208 U.S. 412, 422, 28 S.Ct. 324, 52 L.Ed. 551 (1908), and the rationale that "woman is still regarded as the center of home and family life," *Hoyt v. Florida*, 368 U.S. 57, 62, 82 S.Ct. 159, 7 L.Ed.2d 118 (1961), *overruling recognized by Payne*, 501 U.S. at 829 n. 1, 111 S.Ct. 2597.

{42} We also note that some physical characteristics, such as the ability to become pregnant, may have profound health consequences. For example, there is undisputed evidence in the record that carrying a pregnancy to term may aggravate pre-existing conditions such as heart disease, epilepsy, diabetes, hypertension, anemia, cancer, and various psychiatric disorders. According to these sources, pregnancy also can hamper the diagnosis or treatment of a serious medical condition, as when a pregnant woman cannot receive chemotherapy to treat her cancer, or cannot take psychotropic medication to control symptoms of her mental illness, because such treatment will damage the fetus. The evidence presented in this case concerning the health consequences of pregnancy accords with the expert medical testimony presented in other cases. *See, e.g., Doe*, 515 A.2d at 142; *Moe*, 417 N.E.2d at 393 n. 10.

■ {43} In light of these factors, we conclude that classifications based on the unique ability of women to become pregnant and bear children are not exempt from a searching judicial inquiry under the Equal Rights Amendment to Article II, Section 18 of the New Mexico Constitution. New Mexico's state constitution requires the State to provide a compelling justification for using such classifications to the disadvantage of the persons they classify.

## C.

■ {44} Looking "beyond the classification to the purpose of the law," Tussman & tenBroek, *supra*, at 346, it is apparent that men and women who meet the Department's general criteria regarding financial and medical need are similarly situated with respect to their eligibility for medical assistance in this case. The basic objective of Title XIX of the federal Social Security Act is to provide qualified individuals with necessary medical care. *See* 42 U.S.C. § 1396; *Hern*, 57 F.3d at 910–11. Likewise, "[t]he mission of the New Mexico Medical Assistance Division is to maximize the health status of Medicaid-eligible individuals by furnishing payment for quality health services at levels comparable to private health plans." 8 NMAC 4.MAD.002.

{45} While Title XIX gives the State some flexibility to determine the extent of coverage for the required categories of medical services, several federal courts, including the Tenth Circuit, have "interpreted Title XIX and its accompanying regulations as imposing a general obligation on [participating] states to fund those mandatory coverage services that are medically necessary." *Hern*, 57 F.3d at 911.[4] Apart from the restrictions on federal funding imposed by the Hyde Amendment, "[a]bortion falls under several of these 'mandatory coverage' categories." *Id.* at 910. Further, the mandatory coverage services available under state law generally rely on the standard of medical necessity. *See* 8 NMAC 4.MAD.601 (providing for services "which are medically necessary for the diagnosis and/or treatment of

---

4. We recognize that the Second Circuit disagrees with this interpretation to the extent it implies that a participating state is required to provide certain kinds of durable medical equipment to every Medicaid-eligible individual who has a rare condition or unusual need. *See DeSario v. Thomas*, 139 F.3d 80, 96 (2d Cir.1998). The present case, however, does not involve benefits of the kind requested by the *DeSario* plaintiffs, and the defendant in *DeSario* is a state that has been ordered to provide medically necessary abortions to comply with its state constitution. *See Doe*, 515 A.2d at 162.

illnesses, injuries, or conditions of recipients").

{46} Except in the cases of rape or incest, or when necessary to save the life of the mother, Rule 766 denies state funding for abortions even when they are medically necessary. Under the Department's regulations, there is no comparable restriction on medically necessary services relating to physical characteristics or conditions that are unique to men. Indeed, we can find no provision in the Department's regulations that disfavors any comparable, medically necessary procedure unique to the male anatomy. For example, the Department does not explicitly condition reimbursement for any covered health service for income-eligible men on a physician's certification that the care is necessary to save the life of the patient.

{47} Thus, Rule 766 undoubtedly singles out for less favorable treatment a gender-linked condition that is unique to women. *See Geduldig*, 417 U.S. at 501, 94 S.Ct. 2485 (Brennan, J., dissenting); Sunstein, *supra*, at 32–33. "Since only women become pregnant, discrimination against pregnancy by not funding abortion when it is medically necessary and when all other medical[ly necessary] expenses are paid by the state for both men and women is sex oriented discrimination." *Doe*, 515 A.2d at 159. We determine that Rule 766 employs a gender-based classification that operates to the disadvantage of women and is therefore presumptively unconstitutional. In order to survive the heightened scrutiny that we apply to such classifications, the State must meet its burden of showing that Rule 766 is supported by a compelling justification.

### D.

{48} The Department asserts that the restriction on medically necessary abortions imposed by Rule 766 serves the State's interests in two ways. First, the Department claims that Rule 766 is a legitimate cost-saving measure. In this regard, we acknowledge that courts very rarely require the government to fund its citizens' exercise of their constitutional rights. *See Harris*, 448 U.S. at 316–18, 100 S.Ct. 2671 (federal govern-

ment is not required to fund a woman's exercise of her constitutional right to abortion); *Howell*, 118 N.M. at 506, 882 P.2d at 547 (concluding that there is no fundamental right to receive public assistance). But that is not to say that when the Department elects to provide medically necessary services to indigent persons, it can do so in a way that discriminates against some recipients on account of their gender.

{49} The Department fails to offer a sufficiently compelling justification for such discrimination in this case. To be sure, Rule 766 may prevent the State from incurring the cost of funding medically necessary abortions not covered by the Hyde Amendment. But the Department's assertion "that it saves money when it declines to pay the cost of a [Medicaid-eligible woman's medically necessary] abortion is simply contrary to undisputed facts." *Maher v. Roe*, 432 U.S. 464, 490, 97 S.Ct. 2376, 53 L.Ed.2d 484 (1977) (Brennan, J., dissenting) (citation omitted).

{50} Pregnant women who qualify for medical assistance from the Department are, by definition, unable to pay for their own medical expenses. Such women have only a limited period of time to obtain a safe, relatively inexpensive abortion after discovering that they are pregnant. The expense of obtaining an abortion increases two to six times in the second trimester. Further, it is not unreasonable to infer that the conditions which make an abortion medically necessary also may have a disabling effect on a pregnant woman's earning capacity. For these reasons, we cannot assume that Medicaid-eligible women are likely to obtain medically necessary abortions with private funds when they are denied state funding under Rule 766.

{51} Indeed, such a result would be incompatible with the second interest asserted by the Department—protecting the potential life of the unborn. If Rule 766 only succeeded in shifting the burden of paying for abortion services to the private sector, then it would lose its effect of preserving potential life. Thus, in order to account for the second interest asserted by the Department, we must assume that the Department stands

ready to accept an increase in the cost of other forms of medical assistance to which Medicaid-eligible pregnant women are entitled when they are denied medically necessary abortions.

{52}  Under this scenario, for every woman who is denied state funding for a medically necessary abortion, we must assume the Department will be obligated to contribute a significant portion of the funds used to pay for medical expenses associated with bringing a pregnancy to term.[5]  These expenses may include the cost of providing midwife services, *see* 8 NMAC 4.MAD.718.1, case management services for pregnant women and their infants, *see* 8 NMAC 4.MAD.772 (May 15, 1996), coverage for newborn infants, *see* 8 NMAC 4.NBN.400, and other pregnancy-related services, *see* 8 NMAC 4.PSO.400; 8 NMAC 4.PWN.400.  In addition, the Department in some cases may have to cover medical treatment necessary to control the aggravation of pre-existing conditions that, according to Plaintiffs' allegations, would render an abortion medically necessary.  *See* 42 C.F.R. § 440.210(a)(2) (1997) (mandatory coverage for "other conditions that might complicate the pregnancy").  It is undisputed that the State's expenses associated with bringing a pregnancy to term generally are much greater than its expenses associated with providing a medically necessary abortion.[6]  For these reasons, we cannot conclude that Rule 766 serves as the least restrictive means of reducing the State's costs of providing medical assistance.

{53}  We next consider whether, apart from its financial impact, Rule 766 serves as the least restrictive means of advancing the State's interest in the potential life of the unborn.  Under federal law, the State's interest in the potential life of the unborn is never compelling enough to outweigh the interest in the life and health of the mother.  *See Roe v. Wade*, 410 U.S. 113, 164–65, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973); *Planned Parenthood v. Casey*, 505 U.S. 833, 879, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992) (plurality opinion); *Doe*, 515 A.2d at 157.  Assuming, however, that at some late stage of a woman's pregnancy the State's interest becomes sufficiently compelling to support the denial of public funding, Rule 766 is not the least restrictive means of advancing this interest because it prohibits state funding for most medically necessary abortions at all stages of a woman's pregnancy and without regard to her health except in life-threatening situations.  Further, according to the parties' stipulated facts, Rule 766 also may deny coverage for an abortion even when it is determined that the fetus will not be viable because it suffers from a fatal physical or mental impairment.

{54}  For these reasons, we conclude that Rule 766 is not the least restrictive means to advance the State's interest in the potential life of the unborn at a point when that interest may become compelling.  Further, because the State fails to provide a compelling justification for treating men and women differently with respect to their medical needs in this instance, we conclude that Rule 766 violates the Equal Rights Amendment to Article II, Section 18 of the New Mexico Constitution.

## IV.

{55}  We next address the Department's claim that the district court lacks

---

5.  Under Title XIX, the federal government generally reimburses between 50 and 83 percent of a participating state's expenses for providing medical assistance.  *See* 42 U.S.C. § 1396d(b)(1).  For certain services, however, this percentage may be higher.  *See, e.g., id.* § 1396b(a)(5) (federal government provides 90% reimbursement for sums attributable to family planning services and supplies).

6.  According to the parties' stipulations, an abortion in the early stages of pregnancy costs between $275 and $350.  From January to November 1994, the Department paid for 45 abortions at a cost of $11,009.25.  From December 1994 to May 1995, the Department paid for 161 abortions at a cost of $25,785.60.  In contrast, the Department paid $23,528,032.61 in hospital costs to provide labor and delivery services to 14,222 women from January to December 1994, for an average cost of $1,654.34 per woman.  This figure does not include the amount paid for other pregnancy-related services.  Thus, even if the federal government reimbursed the Department for 90% of the costs of bringing a pregnancy to term, the related costs incurred by the State would remain comparable to, if not higher than, the amount the State expended per pregnancy for medically necessary abortions during the same time frame.

the authority to remedy this constitutional violation by ordering the State to pay for medically necessary abortions for Medicaid-eligible women. According to the Department, the district court's order is inconsistent with the requirements of Section 27–2–12 of the Public Assistance Act and the provisions in the New Mexico Constitution regarding the separation of powers.

{56} Section 27–2–12 provides that:

Consistent with the federal act and subject to the appropriation and availability of federal and state funds, the medical assistance division of the human services department may by regulation provide medical assistance, including the services of licensed doctors of oriental medicine and licensed chiropractors, to persons eligible for public assistance programs under the federal act.

The Department claims this language means that it cannot provide any medical assistance for which federal reimbursement is unavailable. Thus, according to the Department, the district court violated the Public Assistance Act and exceeded its constitutional powers by enacting law and appropriating state funds for such medical assistance in the case of medically necessary abortions that fall outside the restrictions in the Hyde Amendment. *See* N.M. Const. art. III, § 1 (providing for separation of powers); *id.* art. IV, § 1 (vesting legislative power in the Senate and the House of Representatives); *id.* art. IV, § 30 (limiting payments from the treasury to appropriations by the Legislature).

{57} We do not agree with the Department's proposed construction of Section 27–2–12 of the Public Assistance Act. Section 27–2–12 does not expressly prohibit funding medically necessary abortions for Medicaid-eligible women, nor does it explicitly state that funding for this particular medical procedure is contingent on federal reimbursement. Indeed, the Legislature has considered and rejected such language. *See* S.52, 42d Leg., 1st Sess. (N.M.1995); H.R.76, 42d Leg., 1st Sess. (N.M.1995). Unlike the specific restriction on the availability of federal funds for abortions imposed by Congress in the Hyde Amendment, New Mexico's Public

Assistance Act only contains general language delegating rulemaking authority to the Department and setting limits on that authority with respect to the State's medical assistance program. Thus, we cannot say the funding restrictions in Rule 766 are compelled by the plain meaning of Section 27–2–12. *See State ex rel. Helman v. Gallegos,* 117 N.M. 346, 353, 871 P.2d 1352, 1359 (1994) (noting circumstances under which the plain-meaning rule does not apply).

{58} In this case, the Department's power to adjust the distribution of state funds under the medical assistance provisions of the Public Assistance Act in order to comply with the Bill of Rights guaranteed by the New Mexico Constitution "arise[s] from the statutory language by fair and necessary implication." *Howell,* 118 N.M. at 504, 882 P.2d at 545. The basic purpose of Section 27–2–12 is to ensure that, if New Mexico is going to participate in the federal Medicaid program, the State's plan must provide for the categories of medical assistance and the level of state funding that are required to remain eligible for federal financial assistance under Title XIX of the Social Security Act. *Cf.* 42 U.S.C. § 1396a(a)(10) (requiring state plan to provide categories of medical assistance listed under 42 U.S.C. §§ 1396d(a)(1) to (5), (17), (21)); *id.* § 1396a(a)(2) (requiring state plan to provide for financial participation by the State); *id.* § 1396c (providing for discontinuation of federal payments if state plan does not comply with these federal requirements). But this linkage to "[f]ederal law cannot enlarge state executive power beyond that conferred by the state constitution." *State ex rel. Taylor v. Johnson,* 1998–NMSC–015, ¶ 42, 125 N.M. 343, 961 P.2d 768. Where, as here, state funds within the Department's control are used in a manner that does not conflict with federal law in order to fulfill the fundamental guarantees of our state constitution, we cannot say that Section 27–2–12 has been violated. *Cf. Boley v. Miller,* 187 W.Va. 242, 418 S.E.2d 352, 358 (1992) (refusing to construe state medical assistance statute as prohibiting use of state funds to pay for abortions that did not qualify for federal matching funds); *Dodge v. Department of*

*Soc. Servs.*, 657 P.2d 969, 975–76 (Colo.Ct. App.1982) (same).

{59} Our conclusion that the district court's order does not violate Section 27-2-12 also disposes of the Department's claim that the district court violated the provisions in our state constitution requiring separation of powers. In requiring the Department to disburse state funds appropriated by the Legislature in a manner consistent with the Equal Rights Amendment to Article II, Section 18 of the New Mexico Constitution, the district court did not usurp the Legislature's power to enact new laws or appropriate funds. *See Moe*, 417 N.E.2d at 395; *Dodge*, 657 P.2d at 973–75; *Georgia by Dep't of Med. Assistance v. Heckler*, 768 F.2d 1293, 1296 (11th Cir.1985). " 'It is a function of the judiciary when its jurisdiction is properly invoked to measure the acts of the executive and the legislative branch solely by the yardstick of the constitution.' " *State ex rel. Clark*, 120 N.M. at 570, 904 P.2d at 19 (quoting *State ex rel. Hovey Concrete Prods. Co. v. Mechem*, 63 N.M. 250, 252, 316 P.2d 1069, 1070 (1957)). The district court did not exceed its power in performing that function here.

{60} The Department's final contention is that a permanent injunction is not warranted because Plaintiffs have not established that they will suffer irreparable injury if Rule 766 is implemented or that granting an injunction is not adverse to the public interest. *See National Trust for Historic Preservation*, 117 N.M. at 595, 874 P.2d at 803 (listing requirements for preliminary injunction). These assertions, however, rely on the Department's arguments regarding standing and separation of powers, which we have rejected earlier in this opinion. Therefore, we conclude that the district court did not err in permanently enjoining the Department from enforcing Rule 766. *Cf. Doe*, 515 A.2d at 162 (finding that enforcement of abortion regulation would cause irreparable injury and granting injunctive relief).

## V.

{61} Based on the independent grounds provided by the Equal Rights Amendment to Article II, Section 18 of the New Mexico Constitution, we affirm the district court's orders granting Plaintiffs' motion for summary judgment, permanently enjoining the Department from enforcing its May 1995 revision of Rule 766, and awarding costs to Plaintiffs. We reverse the district court's orders granting Klecan and Schaurete's motion to intervene for failure to comply with the requirements of Rule 1–024(A)(2). Because we have previously granted a stay of Plaintiffs' cross-appeal with respect to the issue of attorney fees, we defer ruling on that issue or the award of costs on appeal until further order of this Court.

{62} **IT IS SO ORDERED.**

FRANCHINI, C.J., BACA, MCKINNON, III, JJ., and ARMIJO, Judge, New Mexico Court of Appeals, sitting by designation, concur.