2005-NMCA-119

122 P.3d 43

**STATE of New Mexico,
Plaintiff–Appellee,**

v.

**Sonia JOJOLA, Defendant–Appellant.**

**No. 24,148.**

Court of Appeals of New Mexico.

Aug. 19, 2005.

Certiorari Granted,
Nos. 29,441, 29,442,
Oct. 13, 2005.

**460**

Patricia A. Madrid, Attorney General, Santa Fe, Jacqueline R. Medina, Assistant Attorney General, Albuquerque, for Appellee.

John Bigelow, Chief Public Defender, Cynthia S. Sully, Assistant Appellate Defender, Santa Fe, for Appellant.

## OPINION

PICKARD, J.

{1} Defendant appeals her conviction for child abuse (resulting in death) of her boyfriend's eighteen-month-old child (Victim). On appeal, Defendant argues that (1) the trial court improperly communicated with a juror during jury deliberations, (2) there was insufficient evidence to conclude that Defendant inflicted the injuries that led to Victim's death, (3) prosecutorial misconduct deprived

Defendant of a fair trial, (4) the trial court allowed witnesses to render improper opinions, (5) erroneous jury instructions were submitted to the jury, (6) Defendant was denied due process due to the trial court's aggravating Defendant's sentence and finding that child abuse resulting in death is a serious violent offense, and (7) cumulative error.

{2} Due to our conclusion that the trial court's improper communication with a juror, as well as the State's failure to rebut the presumption of prejudice that arose from the communication, warrants reversal of Defendant's convictions, we are not required to address the majority of issues raised by Defendant. However, because Defendant would be entitled to a dismissal of the charges on remand if the evidence adduced at trial was insufficient to support her conviction, we are required to address Defendant's argument that there was not sufficient evidence to conclude that Defendant inflicted the injuries that led to Victim's death. *See State v. Ortiz–Burciaga*, 1999–NMCA–146, ¶ 1, 128 N.M. 382, 993 P.2d 96. We conclude that there was sufficient evidence to support Defendant's conviction, but based on the trial court's improper communication with a juror, we reverse Defendant's conviction.

## FACTS AND BACKGROUND

{3} On April 9, 2001, Defendant contacted 911 and reported that Victim had fallen from a bed and was not moving. When the paramedics arrived, they found Victim breathing but unconscious and observed marks and abrasions on Victim's forehead. Defendant, who was the sole caretaker of Victim when she discovered Victim's injuries, told paramedics that she had not seen what had happened to Victim but that Victim may have fallen from the lower bunk bed that was located in the room in which Victim was found injured. Defendant emphasized, however, that Victim could not have fallen off the top bunk bed because he could not climb the ladder.

{4} The paramedics transported Victim to an emergency room by ambulance. At the emergency room, the treating physician noted that Victim had bruises on his head and that one of Victim's pupils was bigger than

the other. The physician, suspecting Victim had suffered a brain injury, ordered a CT scan of Victim. Dr. Hart, the physician who interpreted the CT scan, reported that Victim had a skull fracture and a broad subdural hematoma. Victim was transferred for surgery to remove the subdural hematoma; however, in the evening of April 9, 2001, Victim died during surgery. A later autopsy indicated that Victim died due to the head injury.

{5} In the early morning hours of April 10, 2001, Defendant was questioned by a detective from the Albuquerque Police Department (APD). Defendant stated that the only thing she saw Victim do was to start to climb into the lower bunk bed. The detective told Defendant that Victim could not have sustained the injuries that led to Victim's death from a fall from the lower bunk bed, which was later determined to be 18 inches off the floor. However, once again, Defendant continued to state that Victim could not climb to the top bunk bed.

{6} Defendant was indicted on April 20, 2001, for intentional child abuse resulting in death or in the alternative negligent child abuse resulting in death. At trial, Defendant attempted to argue that Victim's biological parents had access to Victim and may have inflicted the injuries that caused Victim's death. At trial, Defendant testified to the following facts:

{7} Victim's mother (Mother) assumed care for Victim at 6:00 p.m. on April 6, 2001, and returned Victim to Defendant's care at approximately 7:00 p.m. on April 8, 2001. After Mother returned Victim to Defendant, Defendant put Victim to bed between 8:00 p.m. and 9:30 p.m. Defendant's stomach began to hurt between 1:00 a.m. and 1:30 a.m. on April 9, 2001. Victim's father (Father) took Defendant and Victim to the emergency room at approximately 2:00 a.m. on April 9, 2001, so that Defendant could receive treatment for her stomach. Father woke Victim up and got Victim dressed in order to accompany Defendant and Father to the hospital. Defendant was not released from the emergency room until approximately 8:00 a.m. on April 9, 2001. Father cared for Victim in the emergency room's waiting area until Defen-

dant was released at approximately 7:30 a.m. to 8:00 a.m. on April 9, 2001.

{8} Victim was sleeping on the way back from the emergency room and upon arriving home, Defendant took Victim from the car and placed him in his bed. Defendant fell asleep in the master bedroom and Father slept in the room that contained the bunk bed. Defendant awoke at 4:10 p.m. and proceeded to wake up Father. Father left for work at 4:45 p.m.

{9} Defendant woke Victim up shortly after Father had gone to work and Victim seemed "wobbly" when Defendant woke him up. Defendant placed Victim in his highchair and attempted to feed Victim pizza but Victim was not hungry. Victim was in his highchair for approximately 20 to 25 minutes, after which Defendant got Victim down and watched Victim walk over to the bed and crawl up onto the bed. Defendant heard a noise and saw Victim lying on his left side, at which time Defendant called 911.

{10} Father testified at the trial that when he and Victim were in the emergency room's waiting room while Defendant was receiving care for the upset stomach in the early morning hours of April 9, 2001, Victim was "hyper and running around," and he ate chips and candy and drank some Coke. Father also testified that although Victim slept on the way back from the hospital, Victim became playful when he returned home and began to climb all over. Consequently, Defendant had to take Victim from the room in which he was playing with Father and put Victim to bed in another room. Additionally, a detective from APD testified that Defendant told him that Victim was doing fine when Victim, Father, and Defendant returned from that visit to the emergency room.

{11} In attempting to prove that Defendant inflicted the injuries that led to Victim's death, the State introduced the testimony of Dr. Hart, who testified as an expert in neuroradiology and pediatric radiology. Dr. Hart gave his opinion that the broad subdural hematoma that Victim suffered could not have been caused from a short fall such as one that might occur if a person were to fall

18 inches from a bed to the floor. Dr. Hart further testified that a person with the type of injuries that Victim suffered would not want to eat or play. Additionally, Dr. Hart testified that the injury Victim suffered occurred in a matter of minutes to less than a few hours before it was discovered.

{12} The State also presented the testimony of Dr. Skirboll, who was the surgeon who operated on Victim on the evening Victim died. He testified as an expert in neurosurgery. Dr. Skirboll testified that the injury Victim suffered was an acute injury and therefore could have occurred between seconds to two days prior to being diagnosed. Dr. Skirboll then said, "Acute maybe is one day, two days, something like that." Dr. Skirboll also testified that he would not expect a person with this type of injury to be eating or walking. Furthermore, Dr. Skirboll testified that an injury such as the one inflicted upon Victim would be unusual in a case where a person fell only 18 inches to the floor.

{13} Dr. Nashelsky testified for the State as an expert in forensic pathology and was the pathologist who performed Victim's autopsy. Dr. Nashelsky stated that Victim's injuries appeared to occur very soon before death. Also, Dr. Nashelsky testified that after receiving the type of injuries that Victim suffered, any person would seem abnormal and it would be highly unlikely for Victim to climb onto a bed. Dr. Nashelsky testified that Victim's injuries were consistent with an adult taking Victim and shaking him and throwing him against a wall or a floor. Furthermore, Dr. Nashelsky testified that Victim's injuries were inconsistent with an 18–inch fall. In his autopsy report, Dr. Nashelsky determined that the manner of Victim's death was homicide.

{14} Defendant presented the testimony of Dr. Dragovic, who testified as an expert in pathology, forensic pathology, and neuropathology. Dr. Dragovic, who reviewed reports of Victim's autopsy, stated that the bleeding in Victim's brain occurred over a period of time and would not have occurred instantaneously. However, Dr. Dragovic testified that after receiving an injury of this type,

Victim would not have acted like a normal child.

{15} Approximately five hours after the jury had begun deliberating, the following exchange took place outside the presence of the jury:

THE COURT: I just need to report there is a juror, and I believe she is the foreperson, I'm not sure, but a juror whom I believe to be the foreperson came to my office and she was complaining that one juror had committed [perjury] that she was the juror that had had a disagreement with that police officer about some ticket and that this juror—

[THE STATE]: What police officer about a ticket?

THE COURT: That she doesn't believe the expert and that she is not going to change her mind and that they could be there for two months and she was not going to change her mind. She reported that to me and I told her, well, just report— you know, just report that you are hung and I told her I'll take it from there. So I guess—

[THE STATE]: Which juror approached you, Judge?

THE COURT: I believe she's—

[DEFENSE COUNSEL]: I guess it wouldn't matter if we know, does it?

THE COURT: I think for the record we need to know. I think she is the foreperson, Rochelle Smith or I think she is Rochelle Smith, yeah. She is sitting right here.

[THE STATE]: Kind of the brown mousey kind of—

THE COURT: Short hair.

[THE STATE]: I thought the last note was from Mr. Anthony.

THE COURT: What she said was kind of in relation to what the last— what the note said so it's a continuation of that and I'm trying to summarize what she told me. But I told her to continue and do whatever she had to do and just report— just report to me and I could handle it from there.

[THE STATE]: Is she going to send a note out?

THE COURT: She said, well, I'll just indicate to you that we're hung.

{16} Immediately after this exchange between the trial court and counsel, the bailiff informed the trial court that the juror had said to disregard the previous information. Furthermore, at the same time, the jury sent a note stating that it would need additional time after 5:00 p.m. to continue to deliberate. Soon afterwards, the jury found Defendant guilty of the four alternative ways of committing child abuse that were submitted to it.

## DISCUSSION

**1. There was sufficient evidence that Defendant inflicted the injuries that led to Victim's death.**

{17} Defendant argues that there was insufficient evidence to support her conviction because there was no evidence that Defendant was present when Victim received his injuries. Defendant contends that medical testimony simply could not establish the time at which Victim's injuries were inflicted. While there was ample evidence and conflict in the evidence upon which Defendant could argue, and did argue, that the injury occurred while Victim was in the care of Father at the hospital, we disagree with Defendant that there was insufficient evidence that the injuries occurred during her custodial care.

{18} Recently, in *State v. Garcia*, 2005–NMSC–017, 138 N.M. 1, 116 P.3d 72, our Supreme Court held:

When determining the sufficiency of the evidence, the court views the evidence in a light most favorable to the verdict, considering that the State has the burden of proof beyond a reasonable doubt. The court should not re-weigh the evidence to determine if there was another hypothesis that would support innocence or replace the fact-finder's view of the evidence with the appellate court's own view of the evidence.

*Id.* ¶ 12 (internal citations omitted). The Court also noted that our role is to determine whether a rational fact-finder could determine beyond a reasonable doubt the essential facts necessary to convict the accused. *Id.* Reasonable doubt is defined as "a doubt based upon reason and common sense—the kind of doubt that would make a reasonable person hesitate to act in the graver and more important affairs of life." UJI 14–5060 NMRA.

{19} In this case, according to the jury instructions, an essential element of each of the alternative crimes with which Defendant was charged was that Defendant had either intentionally or negligently caused the injuries that led to Victim's death. Also, the instructions informed the jury that the State bore the burden of proving this element, as well as each and every element of the crimes, beyond a reasonable doubt. Our review indicates that although much of the evidence the State used to prove that Defendant had caused Victim's injuries was based on circumstantial evidence and expert testimony, the State presented sufficient evidence to prove beyond a reasonable doubt that Defendant caused Victim's injuries. *See State v. Brown*, 100 N.M. 726, 728, 676 P.2d 253, 255 (1984) (holding that a verdict may be supported by direct or circumstantial evidence).

{20} Defendant concedes that Victim was in Defendant's sole care for the 56 minutes preceding Defendant's discovery of Victim's injuries. Expert testimony presented at trial indicated that (1) Victim's injuries may have been inflicted "minutes" before Victim began displaying symptoms of the injury; (2) once Victim had suffered the injuries, Victim would have quickly "become very seriously sick as if not responding"; (3) Victim's injuries were acute, which means they may have been inflicted "seconds" prior to discovery of the injury; and (4) Victim's skull fracture looked as though it had been inflicted a very short time prior to Victim's death. Therefore, in viewing the evidence in the light most favorable to the verdict, we conclude that there was sufficient evidence to support a finding that Victim's injuries were inflicted when he was in the sole care of Defendant.

{21} Other evidence also tended to support to the jury's finding that Defendant caused Victim's death. Evidence was presented indicating that (1) Defendant's explanation of how Victim was injured was unreasonable, (2) Victim's injuries were caused by a large amount of speed and force, (3) a person with injuries similar to Victim's

would not be acting normally and would have a hard time walking and crawling onto a bed, and (4) Defendant testified that Victim walked to his bedroom and crawled into bed. We recognize that evidence was presented to the jury indicating that Victim's injuries may have occurred when Defendant was not caring for Victim; however, where evidence is in conflict, we accept any interpretation of the evidence that supports the trial court's findings, provided that such a view of the evidence is not inherently improbable. *See Crownover v. Nat'l Farmers Union Prop. & Cas. Co.*, 100 N.M. 568, 571, 673 P.2d 1301, 1304 (1983) (stating that the physical facts rule is only used when the physical conditions are "indisputably established" and the conflicting testimony is "inherently improbable"). Here, we rule that the jury's view of the evidence was not inherently improbable.

**2. The trial court improperly communicated with a juror, and the State failed to rebut the presumption of prejudice that arose from the communication.**

{22} Defendant argues that the trial court improperly communicated with a juror during jury deliberations and that the State failed to rebut the presumption of prejudice that arose from the communication, and therefore Defendant's conviction should be reversed. We agree. In *State v. Neely*, 112 N.M. 702, 711, 819 P.2d 249, 258 (1991), our Supreme Court noted that it is improper for the trial court to have any communication with the jury concerning the subject matter of the court proceedings, except in open court and in the presence of the accused and his counsel. The Court went on to hold that a " 'presumption of prejudice arises whenever such an improper communication occurs, and the State bears the burden of rebutting the presumption by making an affirmative showing on the record that the communication did not affect the jury's verdict." ' *Id.* (quoting *Hovey v. State*, 104 N.M. 667, 670, 726 P.2d 344, 347 (1986) (emphasis omitted)). We are not required to find reversible error in every communication between the court and a juror when the communication is not relevant to the subject matter of the case, such as when the communication is about scheduling or housekeeping matters. *Neely,*

112 N.M. at 711–12, 819 P.2d at 258–59. Thus, we must first determine whether the communication between the trial court and the juror concerned the subject matter of the case, and if we conclude that the communication was related to the subject matter of the case, we then must determine if the State sufficiently rebutted the presumption of prejudice that arose from the communication.

{23} We have previously held that a jury's deliberation process is sacrosanct. *State v. Ramming*, 106 N.M. 42, 49, 738 P.2d 914, 921 (Ct.App.1987). " 'The sanctity of jury trials cannot be thus subjected to the hazard of suspicion.' " *State v. Rodriguez*, 2004–NMCA–125, ¶ 12, 136 N.M. 494, 100 P.3d 200 (quoting *Melton v. Commonwealth*, 132 Va. 703, 111 S.E. 291, 294 (1922)), *cert. granted*, 2004–NMCERT–010, 136 N.M. 542, 101 P.3d 808. Private communications between the trial court and a juror may "open the way to abuses and may destroy the confidence of the accused and of the public in the fairness of the trial." *State v. Beal*, 48 N.M. 84, 93, 146 P.2d 175, 181 (1944). "[W]e must take every precaution to avoid casting even the slightest doubt on the propriety of jury verdicts in criminal proceedings." *Rodriguez*, 2004–NMCA–125, ¶ 12, 136 N.M. 494, 100 P.3d 200.

{24} Here, the conversation between the trial court and the juror concerned the jury's deliberations. The communicating juror informed the trial court of another juror's view of the case when the communicating juror stated that the other juror did not believe the expert and that the other juror was not going to change her mind. The trial court then instructed the juror to "just report that you are hung." Additionally, the trial court instructed the juror to "continue and do whatever" the juror had to do and to "just report— just report to me." The juror then stated, "[W]ell, I'll just indicate to you that we're hung." Thus, the record clearly indicates that this communication between the juror and the trial court was related to the subject matter of the case as the communication concerned the inner workings of the jury room and the jurors' view of the evidence. Therefore, the conversation was an improper communication between the trial

court and the jury. We must now determine if the State rebutted the presumption of prejudice that arose from the improper communication.

■ {25} On appeal, the State does not argue that it rebutted the presumption of prejudice at the trial level after counsel had been informed of the communication. The State argues that there was no improper communication; therefore, no presumption of prejudice arose, and thus the State did not need to rebut any prejudice. Having already found that the trial court's communication with the juror was improper, we conclude that a presumption of prejudice did arise and the State's failure to rebut that prejudice warrants reversal.

{26} Indeed, the facts of this case indicate that the State would be hard pressed to rebut the presumption. The trial court informed counsel of the communication with the juror at 4:20 p.m., at which time the communicating juror indicated that the jury was hung and that the other juror would not change her mind even if the jury deliberated for two months. Yet, shortly after 5:00 p.m. on the same day that the communication between the juror and the trial court took place, the jury returned a verdict on all four alternatives of the crime with which Defendant was charged. At a motion hearing held approximately three weeks after the verdict was announced, Defendant asserted, and the State did not disagree, that when the jury filed out to announce its verdict, one juror appeared extremely distraught and seemed ostracized by all the other jurors. Therefore, the presumption of prejudice appears particularly appropriate in this case. Furthermore, the State's complete failure to rebut the presumption of prejudice appears quite similar to what occurred in another leading case.

{27} In *State v. Orona*, 92 N.M. 450, 455, 589 P.2d 1041, 1046 (1979), the trial court answered two notes from the jury outside the presence of the defendant and his counsel. The jury's first note asked how the case got before the grand jury. *Id.* The trial court answered the question through a note by informing the jury that grand jury proceedings are initiated by the district attorney and

that it "really does not matter how a case gets started—the important thing is that you, the jury, hear and decide the entire case on your own." *Id.* The jury sent out a second note, which simply read, "Four not guilty, eight—guilty—both counts." *Id.* The trial court's answer was that "Your verdict must be unanimous. You have not been deliberating all that long, and I request that you continue to see if you can arrive at a unanimous verdict." *Id.* The Supreme Court noted that although the trial court's answer may not have affected the jury's verdict, the court's communication with the jury violated proper trial procedure. *Id.* at 456, 589 P.2d at 1047. The Court also noted that the state made no attempt to rebut the presumption of prejudice that arose from the communications. *Id.* Therefore, the Court held that "[the state h]aving failed to rebut the presumption, we must hold that the judge's communications with the jury were prejudicial and entitled [the] defendant to a new trial." *Id.*

■ {28} We find the facts of *Orona* virtually indistinguishable from the facts of this case, and thus we reverse Defendant's conviction. We do not consider it a sufficient distinction that the jury was told to deliberate further in *Orona* and here it was told to report it was hung. The important factor is that trial courts should not be communicating with the jury except in the presence of counsel and the defendant. *See State v. McCarter*, 93 N.M. 708, 711, 604 P.2d 1242, 1245 (1980) (stating that "[t]his Court has long recognized that any communication by a trial court with the jury must be in open court in the presence of the accused and his counsel," and "[i]t is highly improper for the trial court to have any communication with the jury except in open court and in the presence of the accused and his counsel" (internal quotation marks and citations omitted)). Here, when the juror first told the court that she had a complaint about another juror, the trial judge should have stopped the juror and properly convened the proceedings. The judge having not done so and the State having not rebutted the presumption of prejudice, we are compelled to reverse.

## CONCLUSION

{29}   Defendant's conviction is reversed, and we remand for a new trial.

{30}   **IT IS SO ORDERED.**

FRY and CASTILLO, JJ., concur.