2007-NMSC-035

163 P.3d 476

**Joseph MONTOYA, Petitioner,**

v.

**Robert ULIBARRI, Warden, Respondent.**

**No. 29,218.**

Supreme Court of New Mexico.

June 20, 2007.

Dane Eric Hannum, Albuquerque, NM, for Petitioner.

Gary King, Attorney General, Arthur Pepin, Assistant Attorney General, Santa Fe, NM, for Respondent.

Scott M. Davidson, Ph.D., Esquire, Scott M. Davidson, Albuquerque, NM, for Amicus Curiae New Mexico Criminal Defense Lawyers Association.

## OPINION

MAES, Justice.

{1} Petitioner, Joseph Montoya, appeals from a decision of the district court denying his petition for habeas corpus pursuant to Rule 5–802 NMRA. *See* Rule 12–501 NMRA; Rule 5–802 NMRA. This case presents the issue of whether the protections afforded by the New Mexico Constitution allow a prisoner to obtain habeas relief based upon a freestanding claim of actual innocence, independent of any constitutional violation at trial. We conclude that the continued incarceration of an innocent person is contrary to both due process protections and the constitutional prohibition against cruel and unusual punishment within the New Mexico Constitution. Therefore, we hold that a habeas petitioner may obtain relief if he can establish by clear and convincing evidence that no reasonable juror would have convicted him in light of new evidence. However, Petitioner has failed to meet this standard. Thus, we affirm the district court's denial of Petitioner's habeas petition.

## FACTS AND PROCEEDINGS BELOW

{2} A proper understanding of our determination of the issues presented in this case requires a thorough review of the procedural history of the case, as well as the evidence produced at Petitioner's criminal trial, at the hearing on his motion for a new trial, and at his habeas proceeding. Petitioner was convicted by a jury of second-degree murder, contrary to NMSA 1978, § 30–2–1(B) (1994), and two counts of aggravated assault with a deadly weapon, contrary to NMSA 1978, § 30–3–2(A) (1963). The evidence supporting Petitioner's convictions was summarized by this Court in a Dispositional Order of Affirmance addressing Petitioner's original appeal on the merits. *State v. Montoya,* Dispositional Order of Affirmance, No. 27,-594, ¶¶ 5–11 (Mar. 17, 2003). "[Petitioner] and his mirror image, identical twin, Jeremy, lived in an apartment with their older brother, Jason. As 'mirror image' twins, [Petitioner] is right handed, and Jeremy is left handed. Several witnesses testified that the two brothers, although identical, are distinguishable; [Petitioner] is taller and weighs more than Jeremy. On September 2, 1999, [Petitioner] and Jeremy attended a party, which was, according to [Petitioner], located approximately four or five blocks, or a 'good [ten-] minute walk' from Jason's apartment. [Petitioner] and Jeremy were involved in a fight with [three individuals]. Later that night, at approximately 11:40 p.m., [Petitioner] returned with a gun; in front of numerous witnesses, [Petitioner] fired the gun several times. The victim [Robert Williams] died from a gunshot to the back. Several witnesses specifically identified [Petitioner], as opposed to Jeremy, as the shooter, including Vickie Hughes. She testified that she knew the twins and that she attended the party on the night of the altercation. She identified [Petitioner] as the shooter. The assault victims [Lamar Don James and Kenneth Taylor] testified that the shooter pointed the gun directly at them and fired.

{3} "[Petitioner] testified that, following the initial fight, he and Jeremy went to Jason's apartment, where they told several people about the altercation. [Petitioner] testified that he went into the bathroom and cleaned off a cut near his eye. [Petitioner] testified that he, Jeremy, and Jason went with Gabriel Estrada to the house Estrada shared with the Montoyas' cousin, Vanessa Estrada, because they were afraid to stay at

Jason's apartment. [Petitioner] testified that they stayed at Estrada's house that night." [Petitioner] testified that, after their arrival, he again went into the bathroom to clean off his cut; afterward, they went into the garage to socialize. [Petitioner] testified that he did not have a gun, that he did not talk about going back to the party, and that he was not the shooter. [Petitioner] testified that Jeremy was with him the entire time after they left the party, that Jeremy did not return to the party, and that Jeremy was also not the shooter. [Petitioner] presented alibi witnesses including Jeremy, their brother Jason, and his friends, Steven Sunday, Michael Ponce, and Gabriel Estrada. Jeremy testified that, after the fight at the party, they went to Jason's apartment for about five minutes and then they went to their cousin's house. Jeremy testified that he had never seen a gun at Jason's home. Jeremy testified that neither he nor his twin, [Petitioner], left the Estrada house again that night. Jeremy testified that he was also not the shooter and that he was positive that [Petitioner] was not the shooter. Gabriel Estrada, Sunday, Ponce and Jason also all testified that the twins came to Jason's apartment after the initial fight for a short period of time, then went to the Estrada house. Gabriel Estrada testified that [Petitioner] did not leave the house. Jason testified that he did not own a gun, and he also testified that they went 'straight to the garage' when they arrived at the Estradas' home. Vanessa Estrada testified that [Petitioner], Jeremy, Jason, and Gabriel Estrada arrived at her house at 11:30 that evening, that they went into the garage, and that [Petitioner] and Jeremy were there when she woke up the next morning.

{4} "[Petitioner] was convicted by a jury. After his conviction, he moved for a new trial. Defense counsel, at the hearing on the motion, stated that right after the conclusion of the trial, he received a call from Jeremy asking him to meet with himself, Jason, and his parents. Defense counsel stated that Jeremy told him that he was the shooter. Defense counsel presented evidence that Jeremy took a polygraph which supported his new claim that he was the shooter.

{5} "Jeremy again testified at the motion for a new trial. Jeremy's new testimony was not consistent with his own testimony at [Petitioner]'s trial, with [Petitioner]'s trial testimony, with the testimony of [Petitioner]'s alibi witnesses, or with critical details within the testimony of the State's witnesses. Jeremy stated that, after the initial fight, the twins went to Jason's apartment and [Petitioner] got into the shower. Jeremy stated that he had seen a gun in Jason's room, armed himself with the nine millimeter handgun, and, not saying anything to [Petitioner], left the apartment. Jeremy returned to the party . to 'let [the individuals with whom they'd fought earlier] know that they can't be messing with us.' Jeremy claimed that he approached the men, pulled out the gun, and fired a few shots in the air. He claimed that he never pointed the gun directly at anyone, but instead '[o]ver their heads, more or less.' Jeremy described running down the street while firing the gun. He claimed that, while 'shooting in the air,' he 'struck a man,' who 'fell down.' Jeremy further claimed that, when he approached the man whom he just shot, the 'man actually got up and tried to wrestle with me, tried to approach me once again.' Jeremy claimed that he fired another shot 'after [the victim] tried to wrestle with' him. He asserted that he ran away, frightened, because he did not know whether anyone was shooting back. He claimed that he threw the gun away near a school and returned to Jason's apartment. He claimed that this event took him less than ten minutes' total time and that [Petitioner] was not with him. Jeremy invoked his right against self-incrimination and refused to answer questions on cross-examination regarding this trial testimony, including whether he simply recalled testifying at [Petitioner]'s trial, as well as specific questions regarding his prior testimony.

{6} "Defense counsel presented an additional witness who supported Jeremy's new confession. Darius Jones testified that he knew the twins and saw the fight at the party. He asserted that he drove to Jason's apartment and saw Jeremy running from the apartment complex toward the area of the party. He claimed that he went to Jason's apartment and spoke to [Petitioner], who had

just gotten out of the shower; as a result, Jones admitted that both [Petitioner] and Jason knew he had been at Jason's apartment on the night of the party. Jones said he never made a statement to police." *State v. Montoya,* Dispositional Order of Affirmance, No. 27,594, ¶¶ 5–9 (Mar. 17, 2003)

{7} "The trial court denied [Petitioner]'s motion for a new trial. The court found that [Petitioner] and Jeremy colluded to create a complete alibi for both and withheld information from the defense attorney. The court found that the information could have been discovered through the exercise of due diligence and thus was not 'newly discovered' evidence." *State v. Montoya,* Dispositional Order of Affirmance, No. 27,594, ¶¶ 11 (Mar. 17, 2003). Petitioner appealed to the Court of Appeals.

{8} In a Memorandum Opinion, the Court of Appeals affirmed the district court's denial of Petitioner's motion for a new trial, as well as his convictions and sentence. *State v. Montoya,* No. 22,219, slip op. at 5 (N.M. Ct.App. June 17, 2002). The Court held that the standards for granting a new trial based on newly discovered evidence were not met, concluding that the testimony would probably not change the result, the evidence should have been discovered before trial by the exercise of due diligence, and the evidence, "insofar as [Petitioner]'s whereabouts are concerned, could be viewed as merely cumulative of his own alibi defense and therefore merely impeaching of the State's witnesses, who were already impeached on the basis of questions concerning the accuracy of their identification of the correct twin." *Id.* at 4–5.

{9} This Court granted Petitioner's Writ of Certiorari, and issued a Dispositional Order of Affirmance. *State v. Montoya,* Dispositional Order of Affirmance, No. 27,594, ¶ 17 (Mar. 17, 2003) Like the Court of Appeals, this Court concluded that the trial court did not abuse its discretion when it denied Petitioner's motion for a new trial. This Court held that Jeremy's recantation testimony was not newly discovered evidence because, "[Petitioner] had to know at the time of trial that his own testimony was false and, by extension, that Jeremy's trial testimony was false."

*Id.* ¶ 18. The Court stated that "assuming that Jeremy is now being truthful, [Petitioner] chose not to rebut the perjured testimony at trial and instead actually presented it as part of his defense, corroborating it with not only his own testimony but that of several other witnesses." *Id.*

{10} Because the statute of limitations for filing a motion for a new trial based on newly discovered evidence had expired, Petitioner filed a Petition for Writ of Habeas Corpus in the district court on March 3, 2004. *See* Rule 5–614 NMRA (requiring a motion for new trial based on the ground of newly discovered evidence must be made "within two (2) years thereafter, but if an appeal is pending the court may grant the motion only on remand of the case"). The district court originally denied Petitioner's petition without a hearing. This Court granted Petitioner's writ of certiorari and ordered the district court to hold an evidentiary hearing.

{11} At the evidentiary hearing, the district court heard testimony from Jeremy, Petitioner, and a polygraph examiner. Jeremy testified that he shot and killed Robert Williams intentionally, not accidentally. He also stated that he intentionally fired at the other two victims. Jeremy went on to testify that his testimony in Petitioner's original criminal trial was false and constituted perjury. Next, Petitioner testified that he too had lied at his original trial and admitted to committing perjury. Petitioner testified that after being beaten up at the party, he and Jeremy had walked to their brother Jason's apartment where Petitioner took a shower. When he came out of the shower, Jeremy was gone. Petitioner found Jeremy later that night and Jeremy told Petitioner that he had gone back to the party and "shot some guy." Petitioner testified that while awaiting trial, he conspired with Jeremy and their brother Jason to concoct a false alibi.

{12} The polygraph examiner, James L. Wilson, testified that he conducted a polygraph examination of Jeremy Montoya on March 13, 2001, nine days before the March 22, 2001, hearing on Petitioner's Motion for New Trial. During the examination, Mr. Wilson asked Jeremy if he shot Robert Williams, to which Jeremy responded, "Yes."

Jeremy answered in the negative when Mr. Wilson asked him if Petitioner was present at the time Robert Williams was shot. Mr. Wilson testified that using a computer-based analysis program, he calculated the probability that Jeremy was not lying was 99.49 percent. After hearing this evidence, the district court issued its Order Denying Petition for Writ of Habeas Corpus.

{13} Petitioner filed his Petition for Writ of Certiorari in this Court. Following oral argument, this Court granted the writ. In his Petition for Writ of Certiorari, Petitioner raised two questions for review: (1) whether the district court erred in holding that Jeremy's confession at the habeas hearing was not newly discovered evidence, and that the confession if heard by a jury was unlikely to lead to a different result in a new trial; and (2) whether the protections within the federal constitution and the New Mexico Constitution prohibit the imprisonment of the actually innocent, notwithstanding any procedural requirement that exculpatory evidence be newly discovered. We begin our discussion with the issue of whether either the federal or the New Mexico Constitution provides relief for a prisoner asserting a claim of actual innocence.

## DISCUSSION

### Actual Innocence Claim

{14} Whether to recognize a claim of actual innocence, absent any constitutional violation at trial, is a question of law demanding de novo review. *See State v. Attaway*, 117 N.M. 141, 145, 870 P.2d 103, 107 (1994) (indicating de novo review of "threshold constitutional issues"), *modified on other grounds by State v. Lopez*, 2005–NMSC–018, 138 N.M. 9, 116 P.3d 80. Petitioner asserts that, in light of his claim of actual innocence, his continued incarceration is a violation of both the federal and state constitutions. Because Petitioner is asserting rights under provisions of both the federal and state constitutions, we employ the interstitial approach to constitutional interpretation adopted by this Court in *State v. Gomez*, 1997–NMSC–006, ¶¶ 19–21, 122 N.M. 777, 932 P.2d 1. "Under the interstitial approach, the court asks first whether the right being asserted is protected under the federal con-

stitution. If it is, then the state constitutional claim is not reached. If it is not, then the state constitution is examined." *Id.* ¶ 19. When implementing the interstitial approach three questions must be answered: "(1) whether the right being asserted is protected under the federal constitution; (2) whether the state constitutional claim has been preserved; and (3) whether there exists one of three reasons for diverging from federal precedent." *State v. Cardenas–Alvarez*, 2001–NMSC–017, ¶ 6, 130 N.M. 386, 25 P.3d 225.

### Federal Constitutional Protections

{15} The United States Supreme Court discussed the viability of a freestanding claim of actual innocence as a basis for habeas relief in federal courts in *Herrera v. Collins*, 506 U.S. 390, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993). Petitioner Herrera filed a Petition for Writ of Habeas Corpus in federal court, asserting that new evidence demonstrated his actual innocence. His claim, however, was not attached to any assertion that a constitutional violation had occurred during his criminal trial. *Id.* at 396–98, 113 S.Ct. 853. Instead, Herrera argued that because he was innocent, his death sentence violated the Eighth Amendment's prohibition against cruel and unusual punishment as well as the Fourteenth Amendment's guarantee of due process. *Id.* at 396–97, 113 S.Ct. 853. The majority in *Herrera* denied Herrera's federal habeas petition. The Court refused to conclude that the incarceration or execution of an actually-innocent person violates the Fourteenth or the Eighth Amendment to the United States Constitution, holding that "[c]laims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding." *Id.* at 400, 113 S.Ct. 853. The majority stated that "in state criminal proceedings the trial is the paramount event for determining the guilt or innocence of the defendant. Federal habeas review of state convictions has traditionally been limited to claims of constitutional violations occurring in the course of the underlying state criminal

proceedings." *Id.* at 416, 113 S.Ct. 853. The Court refused to expand the scope of habeas review to include claims of innocence independent of a claim of constitutional violation when there is a state avenue open to correct an error of fact. The Court stated "that a claim of 'actual innocence' is not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits." *Id.* at 404, 113 S.Ct. 853.

{16} In reaching its conclusion that Herrera's claim of actual innocence did not warrant federal habeas relief, the Court stated " '[f]ederal courts are not forums in which to relitigate state trials.' " *Id.* at 401, 113 S.Ct. 853 (quoting *Barefoot v. Estelle,* 463 U.S. 880, 887, 103 S.Ct. 3383, 77 L.Ed.2d 1090 (1983) (overruled on other grounds)). Instead, the majority emphasized the role of executive clemency in providing relief to prisoners demonstrating actual innocence. *Id.* at 415–417, 113 S.Ct. 853. "History shows that the traditional remedy for claims of innocence based on new evidence, discovered too late in the day to file a new trial motion, has been executive clemency." *Id.* at 417, 103 S.Ct. 3383. Federal Circuit Courts of Appeal interpreting *Herrera* have concluded "that the refusal by the United States Supreme Court to hold that a claim of actual innocence is grounds for relief means that there exists no constitutional prohibition against leaving an innocent person in jail if the State provides for a pardon based upon innocence." *People v. Cole,* 1 Misc.3d 531, 765 N.Y.S.2d 477, 484 (App.Div. 2003) (citing *Royal v. Taylor,* 188 F.3d 239, 243 (4th Cir.1999); *Sellers v. Ward,* 135 F.3d 1333, 1338–39 (10th Cir.1998); *Lucas v. Johnson,* 132 F.3d 1069, 1075–77 (5th Cir.1998); *Meadows v. Delo,* 99 F.3d 280, 283 (8th Cir.1996); *Milone v. Camp,* 22 F.3d 693, 705 (7th Cir.1994)); *see also State ex rel. Amrine v. Roper,* 102 S.W.3d 541, 546–47 (Mo.2003).

■■■ {17} The New Mexico Constitution vests executive clemency authority with the governor, providing an avenue of relief for prisoners who are actually innocent. N.M. Const. art. V, § 6; NMSA 1978, § 31–21–17 (1955). Because there is an opportunity for an innocent person to be pardoned in New Mexico, the incarceration of an individual who is actually innocent does not violate the federal constitution. *See Cole,* 765 N.Y.S.2d at 484. Since the freestanding claim of innocence asserted by Petitioner is "not cognizable under the federal constitution, we now examine Petitioner's state constitutional claim." *Cardenas–Alvarez,* 2001–NMSC–017, ¶ 10.

*Preservation*

■■■ {18} Our examination of Petitioner's state constitutional claim begins with a determination of whether Petitioner preserved his claim below.

> [W]hether a state constitutional claim has been preserved depends on how our precedent treats the constitutional provision in question. If there is no precedent construing the state constitutional provision more broadly than its federal analog the defendant must assert at trial that the state constitution should be interpreted more broadly and provide reasons for the requested departure.

*Id.* ¶ 11 (internal citation omitted). In his Supplemental Memorandum on Petition for Writ of Habeas Corpus, filed in district court, Petitioner argued both that his claim was cognizable under the federal constitution, and that the guarantees of due process and against cruel and unusual punishment within the New Mexico Constitution provide greater protections than their federal counterparts. In light of this argument, we conclude Petitioner adequately preserved his state constitutional claim.

*Departing from Federal Precedent*

{19} In *Gomez* we articulated three reasons a state court may diverge from federal precedent: "a flawed federal analysis, structural differences between state and federal government, or distinctive state characteristics." 1997–NMSC–006, ¶ 19. Any one of these reasons may provide sufficient justification for departing from federal precedent. *Cardenas–Alvarez,* 2001–NMSC–017, ¶ 14. As we examine Petitioner's claim, we identify both structural differences between our state government and the federal government as

well as distinctive state characteristics that warrant a departure from the federal rule not to hear the freestanding innocence claims of habeas petitioners. Thus, we do not reach the question of whether the federal analysis of actual innocence claims is flawed.

### Structural Differences

■ {20} The majority's decision in *Herrera* to deny the petitioner's habeas corpus petition was informed by concerns of federalism and an unwillingness to overturn convictions of petitioners who have been afforded fair trials in state courts. *See Herrera*, 506 U.S. at 399, 401, 407–08, 113 S.Ct. 853; *Summerville v. Warden, State Prison*, 229 Conn. 397, 641 A.2d 1356, 1378 (1994) (Berdon, J., dissenting) (stating "the federal courts are limited by federalism concerns and by the traditional deference paid to the states in matters of criminal process"). When examining a federal habeas petitioner's claim of actual innocence, the United States Supreme Court must balance the rights of a petitioner to be free from unlawful confinement with a State's interest in comity and finality. The Supreme Court has recognized the right of states to conduct their own criminal trials, announcing that "[f]ederal intrusions into state criminal trials frustrate both the States' sovereign power to punish offenders and their good-faith attempts to honor constitutional rights." *Engle v. Isaac*, 456 U.S. 107, 128, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982). Additionally, the Supreme Court has recognized that the better place to correct an error of fact, including a finding of guilt or innocence, is in state court. *Barefoot*, 463 U.S. at 887, 103 S.Ct. 3383 (stating that "[f]ederal courts are not forums in which to relitigate state trials") (overruled on other grounds).

■ {21} The principles of federalism which informed the majority's decision in *Herrera*, do not constrain this Court in our determination of whether the protections within the New Mexico Constitution allow a habeas corpus petitioner to assert a freestanding claim of actual innocence. Rather than being concerned with principles of federalism, the New Mexico Constitution is obligated to protect our State's sovereignty. In-

trinsic within state sovereignty is an interest protecting the credibility of the state judiciary. *See* Larry May and Nancy Viner, *Actual Innocence and Manifest Injustice*, 49 St. Louis U. L.J. 481, 488 (Winter 2005) (commenting that "[s]tate sovereignty involves significant interests in preserving the accuracy of a state's own trial process and in ensuring the correct determination of guilt or innocence according to state law"). This Court has a particular interest in ensuring accuracy in criminal convictions in order to maintain credibility within the judiciary. " 'We must take every precaution to avoid casting even the slightest doubt on the propriety of jury verdicts in criminal proceedings.' " *State v. Jojola*, 2005–NMCA–119, ¶ 23, 138 N.M. 459, 122 P.3d 43 (quoting *State v. Rodriguez*, 2004–NMCA–125, ¶ 12, 136 N.M. 494, 100 P.3d 200). Additionally, we agree with the United States Supreme Court's assessment that the best place to correct an error of fact is in our state courts. *Barefoot*, 463 U.S. at 887, 103 S.Ct. 3383. Thus, in view of our state interest in insuring accuracy and the superior ability of our state courts to make accurate factual findings, we find sufficient reason to depart from the federal decision not to recognize freestanding innocence claims brought by habeas petitioners.

### Distinctive State Characteristics

{22} In many instances this Court has concluded that the New Mexico Constitution provides greater rights to New Mexico defendants than those rights provided in the federal constitution. *See State v. Nunez*, 2000–NMSC–013, ¶ 15, 129 N.M. 63, 2 P.3d 264 (protecting against double jeopardy); *Cardenas–Alvarez*, 2001–NMSC–017, ¶ 15 (providing additional protection from unreasonable searches and seizures than federal law); *New Mexico Right to Choose v. Johnson*, 1999–NMSC–005, ¶ 27, 126 N.M. 788, 975 P.2d 841 (ensuring a more robust guarantee of equal protection of the law than that provided by the federal constitution). Particularly, the provisions at issue in this case, Article II, Section 18, ensuring due process, and Article II, Section 13, prohibiting cruel and unusual punishment, have been interpreted as providing greater protection than

their federal counterparts. *See State v. Vallejos,* 1997–NMSC–040, ¶¶ 35–38, 123 N.M. 739, 945 P.2d 957; *State v. Rueda,* 1999–NMCA–033, ¶¶ 9–14, 126 N.M. 738, 975 P.2d 351.

{23} Article II, Section 18 of the New Mexico Constitution prohibits the deprivation of life or liberty without due process of law. Fundamental fairness is intrinsic within the concept of due process that is provided by the New Mexico Constitution. *See Vallejos,* 1997–NMSC–040, ¶ 17. We believe that to ignore a claim of actual innocence would be fundamentally unfair. The *Herrera* dissent stated that "[n]othing could be more contrary to contemporary standards of decency, or more shocking to the conscience, than to execute a person who is actually innocent." *Herrera,* 506 U.S. 390, 430, 113 S.Ct. 853 (Blackmun, J., dissenting) (internal citations omitted). We conclude that the conviction, incarceration, or execution of an innocent person violates all notions of fundamental fairness implicit within the due process provision of our state constitution. *See Cole,* 765 N.Y.S.2d at 485 (holding "that the conviction or incarceration of a guiltless person violates elemental fairness, deprives that person of freedom of movement and freedom from punishment and thus runs afoul of the due process clause of the [New York] State Constitution"). To ensure that the principles of fairness within the New Mexico Constitution are protected, we hold that a habeas petitioner must be permitted to assert a claim of actual innocence in his habeas petition. *See Engle,* 456 U.S. at 126, 102 S.Ct. 1558 (articulating that habeas corpus is the last judicial inquiry into the validity of a defendant's criminal conviction and sentence and serves as "a bulwark against convictions that violate 'fundamental fairness' "); *Summerville,* 641 A.2d at 1368 (stating "[h]abeas corpus is the ultimate inquiry into the fundamental fairness of a criminal proceeding").

{24} We find additional support for this holding within Article II, Section 13 of the New Mexico Constitution, prohibiting the infliction of cruel and unusual punishment. N.M. Const. art. II, § 13. A punishment is excessive and unconstitutional if "(1) [The punishment] makes no measurable contribution to acceptable goals of punishment and hence is nothing more than the purposeless and needless imposition of pain and suffering; or (2) [the punishment] is grossly out of proportion to the severity of the crime." *State v. Garcia,* 99 N.M. 771, 780, 664 P.2d 969, 978 (1983) (quoting *Coker v. Georgia,* 433 U.S. 584, 592, 97 S.Ct. 2861, 53 L.Ed.2d 982 (1977)). It cannot be said that the incarceration of an innocent person advances any goal of punishment, and if a prisoner is actually innocent of the crime for which he is incarcerated, the punishment is indeed grossly out of proportion to the severity of the crime. *See Herrera,* 506 U.S. at 431, 113 S.Ct. 853 (Blackmun, J., dissenting) (stating "[t]his Court has ruled that punishment is excessive and unconstitutional if it is nothing more than the purposeless and needless imposition of pain and suffering, or if it is grossly out of proportion to the severity of the crime" (internal quotation marks and citations omitted)); *Cole,* 765 N.Y.S.2d at 485 (holding "that punishing an actually innocent person is disproportionate to the crime (or lack of crime) committed and violates the cruel and inhuman treatment clause").

*Standard Applied to Claims of Actual Innocence*

{25} Having resolved that the New Mexico Constitution permits habeas petitioners to assert freestanding claims of actual innocence, we must now decide what standard should be applied to such claims. In order to determine the appropriate standard, we look to both the United States Supreme Court, as well as other states that entertain postconviction applications for the writ of habeas corpus alleging actual innocence as an independent ground for relief. In *Herrera,* several different standards of proof were suggested as the standard a petitioner must meet to prevail on a freestanding claim of actual innocence. The majority stated:

> [w]e may assume, for the sake of argument in deciding this case, that in a capital case a truly persuasive demonstration of 'actual innocence' made after trial would render the execution of a defendant unconstitutional, and warrant federal habeas relief if

there were no state avenue open to process such a claim.

*Herrera,* 506 U.S. at 417, 113 S.Ct. 853. Justices O'Connor and Kennedy, in a concurring opinion, stated that relief should be reserved for "extraordinarily high and truly persuasive demonstration[s] of actual innocence." *Id.* at 426, 113 S.Ct. 853 (internal quotation marks omitted). In his concurrence, Justice White stated that to warrant relief, a "petitioner would at the very least be required to show that based on proffered newly discovered evidence and the entire record before the jury that convicted him, 'no rational trier of fact could [find] proof of guilt beyond a reasonable doubt.' " *Id.* at 429, 113 S.Ct. 853 (quoting *Jackson v. Virginia,* 443 U.S. 307, 324, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)). The least rigorous standard of proof was offered by Justice Blackmun. He suggested that "to obtain relief on a claim of actual innocence, the petitioner must show that he probably is innocent." *Id.* at 442, 113 S.Ct. 853 (Blackmun, J., dissenting).

{26} The variety of standards advanced by the various opinions in *Herrera,* is echoed by the states recognizing freestanding claims of actual innocence. The California Supreme Court sets a heavy burden on petitioners presenting claims of actual innocence, requiring a petitioner to present evidence that "undermine[s] the entire prosecution case and point[s] unerringly to innocence or reduced culpability." *In re Clark,* 5 Cal.4th 750, 21 Cal.Rptr.2d 509, 855 P.2d 729, 739 (1993) (quoting *People v. Gonzalez,* 51 Cal.3d 1179, 275 Cal.Rptr. 729, 800 P.2d 1159, 1196 (1990)). In contrast, the Illinois Supreme Court stated that it would grant habeas relief to a petitioner that made an evidentiary showing of actual innocence which was "of such conclusive character as would probably change the result on retrial." *People v. Washington,* 171 Ill.2d 475, 216 Ill.Dec. 773, 665 N.E.2d 1330, 1337 (1996) (internal quotation marks and citations omitted).

{27} When the Texas Court of Appeals initially recognized habeas corpus as the appropriate vehicle for an inmate to assert an actual innocence claim, it set a very high burden of proof for petitioners. *See State ex rel. Holmes v. Honorable Court of Appeals for Third District,* 885 S.W.2d 389, 399 (Tex. Crim.App.1994) (en banc). The court held that "in order to be entitled to relief on a claim of factual innocence the applicant must show that based on the newly discovered evidence and the entire record before the jury that convicted him, no rational trier of fact could find proof of guilt beyond a reasonable doubt." *Id.* (adopting the burden of proof set forth by Justice White in his concurrence in *Herrera,* 506 U.S. at 429, 113 S.Ct. 853). This burden was later modified by the Texas Criminal Court of Appeals in *Ex parte Elizondo,* 947 S.W.2d 202 (Tex. Crim.App.1996) (superseded on other grounds by statute). That court decided that a burden of proof "conditioned upon a finding that no rational juror could convict the applicant after introduction of the newly discovered evidence" was too high, since under the standard set forth in *Holmes,* relief would be impossible because exculpatory evidence can never outweigh inculpatory evidence. *Id.* at 205. The court decided that the proper standard for a freestanding claim of actual innocence would allow a case-by-case determination of the reliability of the new evidence. *Id.* at 207. The new exculpatory evidence can then be directly weighed against the inculpatory evidence which was the basis for the conviction. The court determined that because the jury's conviction at trial is considered valid, the appellate court's "job is not to review the jury's verdict but to decide whether the newly discovered evidence would have convinced the jury of [sic] applicant's innocence." *Id.* The court held relief should be granted if the petitioner can convince the court "by clear and convincing evidence that no reasonable juror would have convicted him in light of the new evidence." *Id.* at 209.

{28} The clear and convincing standard articulated in *Elizondo* has been adopted in Connecticut, Missouri, and New York. *See Miller v. Comm'r of Corr.,* 242 Conn. 745, 700 A.2d 1108, 1132 (1997) (holding "in order to grant a petitioner's request for relief, the habeas court first must be convinced by clear and convincing evidence that the petitioner is actually innocent"); *State ex rel Amrine v. Roper,* 102 S.W.3d 541, 548 (Mo.2003) (en banc) (holding a petitioner asserting a freestanding claim of actual innocence is required

"to make a clear and convincing showing of actual innocence that undermines confidence in the correctness of the judgment"); *Cole,* 765 N.Y.S.2d at 486 (concluding that "a movant making a freestanding claim of innocence must establish by clear and convincing evidence (considering the trial and hearing evidence) that no reasonable juror could convict the defendant of the crimes for which the petitioner was found guilty"). In describing the clear and convincing standard, the Missouri Supreme Court stated that "[e]vidence is clear and convincing when it 'instantly tilts the scales in the affirmative when weighed against the evidence in opposition, and the fact finder's mind is left with an abiding conviction that the evidence is true.'" *Amrine,* 102 S.W.3d at 548 (quoting *In re T.S.,* 925 S.W.2d 486, 488 (Mo.Ct.App.1996)).

{29} The State argues that the proper standard should require a petitioner to prove "that no rational jury would have convicted him, i.e., he proves his innocence beyond a reasonable doubt." However, like the Texas Court of Appeals, we agree that

> if habeas corpus relief is to be conditioned upon a finding that no rational juror could convict the applicant after introduction of the newly discovered evidence, it becomes theoretically impossible for any habeas applicant to sustain his burden because exculpatory evidence can never outweigh inculpatory evidence under this standard of sufficiency.

*Elizondo,* 947 S.W.2d at 205. While the burden on petitioners should not be so insurmountable that it is practically impossible for a petitioner to prove his innocence, it should be more rigorous than the standard imposed on petitioners who are making a motion for a new trial based on newly discovered evidence. In order to warrant a new trial on the basis of newly discovered evidence, a petitioner must show that the evidence "will probably change the result if a new trial is granted." *State v. Garcia,* 2005–NMSC–038, ¶ 8, 138 N.M. 659, 125 P.3d 638. We believe this standard, adopted by the Illinois Supreme Court in *Washington,* 665 N.E.2d at 1336, does not go far enough to protect the public's interest in the finality of a conviction obtained after a petitioner has been afforded all constitutional rights required by law. *See State v. Duran,* 105 N.M. 231, 233, 731 P.2d 374, 376 (N.M.Ct.App.1986) (announcing "[w]e are primarily interested in the finality of criminal adjudications."); *Cole,* 765 N.Y.S.2d at 486 (stating "[t]he government has an interest in the finality of a conviction once it has accorded an accused all of the constitutional rights required by law"). Additionally, because the relief extended to habeas petitioners asserting claims of actual innocence is extraordinary, the standard applied to such claims should be more demanding than the standard that must be met by defendants motioning for a new trial.

{30} Thus, the appropriate standard should fall between the "probably change the result" standard adopted in *Washington* and the "beyond a reasonable doubt" standard found in *Holmes.* Therefore, a petitioner asserting a freestanding claim of innocence must convince the court by clear and convincing evidence that no reasonable juror would have convicted him in light of the new evidence. *See Elizondo,* 947 S.W.2d at 209.

*Introduction of Newly Discovered Evidence*

{31} Having determined the standard of proof to be applied to petitioners asserting freestanding claims of actual innocence, we must identify what evidence a petitioner may introduce to support his innocence claim. Both the State and Petitioner devote significant portions of their arguments to the issue of whether the evidence Petitioner presented at trial constitutes newly discovered evidence under the standard set forth for a motion for a new trial. Under the motion for new trial standard, a defendant must show that the evidence meets six criteria:

> 1) it will probably change the result if a new trial is granted; 2) it must have been discovered since the trial; 3) it could not have been discovered before the trial by the exercise of due diligence; 4) it must be material; 5) it must not be merely cumulative; and 6) it must not be merely impeaching or contradictory.

*Garcia,* 2005–NMSC–038, ¶ 8. Additionally, in the case of recantation testimony, four additional factors support a decision granting a new trial:

"(1) the original verdict was based upon uncorroborated testimony; (2) the recantation occurred under circumstances free from suspicion of undue influence or pressure from any source; (3) the record fails to disclose any possibility of collusion between the defendant and the witness between the time of the trial and the retraction; and (4) the witness admitted [the] perjury on the witness stand and thereby subjected [himself or] herself to prosecution."

*See State v. Sena*, 105 N.M. 686, 687, 736 P.2d 491, 492 (1987).

{32} We agree with the State's assertion that the evidence presented by Petitioner at his habeas hearing does not warrant relief under the standard applicable to motions for a new trial because the evidence could have been discovered before trial by the exercise of due diligence, there was clearly collusion between Petitioner and the witness, and Petitioner's conviction was not based on the uncorroborated testimony of the recanting witness. *State v. Montoya*, Dispositional Order of Affirmance, No. 27,594 (Mar. 17, 2003). However, the fact that the evidence presented by Petitioner does not fit within our rubric for newly discovered evidence does not mean that Petitioner's claim will necessarily fail. When examining a freestanding claim of actual innocence, we will not be constrained by the requirements applicable to motions for a new trial. Instead, we examine the evidence presented and evaluate any reliable evidence. *See Cole*, 765 N.Y.S.2d at 481, 485 (examining petitioner's claim of actual innocence despite the fact that he could not meet the criteria for a new trial on the grounds of newly discovered evidence because he could not establish that the evidence could not have been discovered prior to trial with due diligence). This is because the focus of our inquiry is on actual innocence rather than when the evidence could have been discovered or procedural error. We conclude, however, that the factors which determine whether evidence is newly discovered under our motion for a new trial standard remain relevant as we review whether or not the evidence presented by Petitioner is reliable.

*Application*

{33} When we originally reviewed the district court's denial of Petitioner's motion for a new trial on direct appeal, we agreed with the district court's conclusion that the evidence of Jeremy's testimony was not so persuasive that it would probably change the result. *Montoya*, Dispositional Order of Affirmance, No. 27,594, ¶¶ 11–12 (Mar. 17, 2003). We see no significant distinction between the evidence elicited at the hearing on Petitioner's motion for a new trial and the evidence presented at the habeas hearing. The crux of the evidence in support of both Petitioner's motion for new trial and his habeas petition was that Jeremy, not Petitioner, was the shooter.

{34} Jeremy's testimony at the habeas hearing constitutes the third version of the events he has testified to under oath. At trial, Jeremy testified that neither he nor Petitioner returned to the party and shot the victims. Subsequently, at Petitioner's motion for new trial, Jeremy testified that after the initial fight he returned to the party while Petitioner was in the shower. He claimed that he approached the victims and fired shots in the air, but never pointed the gun directly at the victims. Jeremy presented yet another version of events at the habeas hearing, giving sworn testimony that he intentionally shot the victim. While Jeremy's testimony that he intentionally shot the victim would, if believed, expose him to additional culpability, we do not find that this deviation from his prior testimony is enough for this Court to say that the evidence would probably change the result on retrial, let alone meet the clear and convincing standard we have outlined for claims of actual innocence.

{35} Additionally, both Petitioner's and Jeremy's credibility is suspect in light of the fact that they testified that they colluded to lie under oath at Petitioner's trial in an effort to absolve themselves of the charged crimes. Assuming that Jeremy's testimony given at the habeas hearing is in fact true, Petitioner chose not to rebut Jeremy's perjured testimony at trial and instead presented it as part of his defense, corroborating it with not only

his own testimony but that of several other defense witnesses. Petitioner's and Jeremy's collusive effort, if true, was an attempt to intentionally deceive the trial court and manipulate the judicial process. The result of this alleged manipulation is that this Court is left with persistent doubt as to the truth of the version of events Petitioner presented at his habeas hearing. Thus, we cannot say that Petitioner has established by clear and convincing evidence that no reasonable juror would have convicted him in light of the new evidence.

{36} Our holding that the evidence in this case does not meet the clear and convincing standard, should not be interpreted as barring all freestanding claims of innocence based on the confession of another. We can foresee instances when the confession of someone other than the habeas petitioner would establish by clear and convincing evidence that no reasonable juror could convict the petitioner of the crimes for which he was found guilty. This case, however, presents a unique factual scenario involving multiple versions of the events in questions and significant credibility issues. In light of these issues, Jeremy's confession does not meet the clear and convincing standard applicable to claims of actual innocence.

## CONCLUSION

{37} For the reasons stated, we affirm the district court's decision to deny Petitioner's petition for habeas corpus relief.

{38} **IT IS SO ORDERED.**

WE CONCUR: EDWARD L. CHÁVEZ, Chief Justice, PAMELA B. MINZNER, PATRICIO M. SERNA, and RICHARD C. BOSSON, Justices (specially concurring).

BOSSON, J., specially concurring.

{39} I fully concur in both the reasoning and the result of the majority opinion. I write to emphasize what a close case this is and to clarify what more could have been done to support the petition for habeas corpus relief.

{40} Jeremy's recantation did undermine the evidence presented by the State at the original trial. And, as the majority notes, sometimes such a recantation will be enough to warrant habeas relief. *Supra,* ¶ 36. However, in this case, the determining factor was to what degree the recantation undermined the evidence. In other words, what weight should we give a recantation when the person giving it had colluded to lie under oath several times prior to the recantation?

{41} I agree with the majority that because of this history the recantation, along with Petitioner's testimony that he had lied as well, was not enough to establish by clear and convincing evidence that no reasonable juror could convict the Petitioner of the crimes for which he was found guilty. The majority of the evidence presented by Petitioner at his habeas hearing came from two individuals who apparently, if their story is to be believed, agreed to lie, got other people to agree to lie for them, then did in fact lie under oath, multiple times. It should be obvious why such evidence is questionable.

{42} Supposing, however, that Jeremy is telling the truth, is there no way to amass sufficient evidence that might persuade a court? I believe there might be. To do so, the parties must present as much evidence as is available and explain what is not available. This is especially true when some of the evidence is not as strong, such as testimony from a person known to lie under oath. The troubling thing to me is that, according to Jeremy and Petitioner's latest version of the story, such supporting evidence should not have been difficult to produce. For example, Petitioner could have presented his other brother, Jason, to testify that he was with Petitioner at the apartment when Jeremy was missing. Another friend of Petitioner and Jeremy, Darius Jones, allegedly saw Petitioner at Jason's apartment when Jeremy was missing. Apparently the twin's uncle saw Petitioner with Jason when the two were searching for Jeremy. Why were none of these witnesses called to testify so as to bolster Jeremy's recantation and provide some undercurrent of credibility? The testimony of any one of them, or better yet all of them, would have strengthened Petitioner's claim. And then there are the eye-witnesses to the shooting who identified Petitioner at trial as the shooter. Perhaps one or more might be persuaded by Jeremy's recantation

that they might have been mistaken in that identification. To date, however, we have no explanation for the absence of any such testimony.

{43} This Court understands the importance of ensuring that innocent people, wrongly convicted, have an opportunity to present their case. But we must also be mindful of the role of the jury in our system of justice. The majority opinion strikes this balance well by utilizing a clear-and-convincing-evidence standard. In this case, Petitioner just failed to meet his burden. But that is not to say that he might not be able to meet his burden in the future.